Larry KRAMER, Plaintiff
Below, Appellant,

v.

WESTERN PACIFIC INDUSTRIES, INC.,
Howard A. Newman and William C.
Scott, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: March 29, 1988.
Decided: Aug. 22, 1988.

Sidney B. Silverman (argued), Pro Hac
Vice, and Harold B. Obstfeld, of counsel, of
Silverman and Harnes, New York, and
Pamela S. Tikellis of Greenfield & Chimi-
cles, Wilmington, for appellant.

David A. Drexler (argued) and Kenneth
J. Nachbar of Morris, Nichols, Arsht &
Tunnell, Wilmington, for appellees.

Before HORSEY, MOORE and WALSH, JJ.

HORSEY, Justice:

In this corporate matter we consider once again the consequences of a cash-out merger upon the standing of a shareholder to pursue a claim of wrongdoing against management. Plaintiff, Larry Kramer, owner of 200 shares of common stock of defendant, Western Pacific Industries, Incorporated ("Western Pacific"), prior to a merger of Western Pacific into Danaher Corporation ("Danaher"), appeals the Court of Chancery's dismissal of his pre-merger suit for loss of standing and the Court's grant of summary judgment for Western Pacific. *Kramer v. Western Pacific Ind., Inc.,* Del.Ch., C.A. No. 8675, Hartnett, V.C. (Sept. 11, 1987) [available on WESTLAW, 1987 WL 17043].

In 1986, following a "bidding war," Danaher acquired Western Pacific pursuant to a tender offer followed by a cash-out merger at a price of $163.00 per share. Prior to the merger's consummation, Kramer filed suit against Western Pacific and the individual defendants, charging that the defendants, in connection with the merger, diverted funds to the individual defendants in the form of stock options and termination agreements and to third parties in the form of excessive fees and expense payments relating to the merger.

The Court of Chancery ruled that this Court's decision in *Lewis v. Anderson,* Del. Supr., 477 A.2d 1040 (1984), required dismissal of Kramer's suit for loss of standing to continue to pursue claims which it found to be derivative rather than individual. Kramer seeks reversal, asserting that the merger did not deprive the Western Pacific shareholders of standing because the amended complaint should be construed as directly attacking the fairness of the merger terms as well as alleging wrongs affecting the individual contractual rights of the Western Pacific shareholders rather than wrongs to the corporation.

Finding *Lewis v. Anderson* to be controlling, we affirm the Court of Chancery's grant of summary judgment for Western Pacific. We construe the claims stated in Kramer's amended complaint to be essentially derivative in nature and not to come within either of *Lewis'* two exceptions. Hence, Kramer, having ceased to be a shareholder of Western Pacific, lacks standing to pursue the derivative claims asserted by his amended complaint.

I

In June 1985, Western Pacific's board of directors, acting through its ten non-management directors, adopted without dissent certain stock options which Kramer challenges as excessive. Individual defendants, Howard A. Newman and William C. Scott, Western Pacific's Chairman and President, respectively, the grantees of the stock options, did not participate in the portion of the board meeting at which the options were discussed. Issuance of the stock options was conditioned upon shareholder approval, but to avoid the expense of convening a special shareholder meeting management placed consideration of the stock options on the agenda for the 1986 annual meeting. In March 1986, the board issued a proxy statement, soliciting shareholder approval of the stock options, and Western Pacific's shareholders approved the stock options on May 6, 1986.

One month earlier, Western Pacific's accountant informed Scott that Edward Trump, on behalf of the Trump Group, was interested in acquiring Western Pacific. Newman delegated Scott to explore the matter with Trump. Although Scott and Trump met for the first time on the day of the annual meeting, the shareholders were not informed at the annual meeting of Trump's interest in acquiring Western Pacific. Scott again met with Trump on May 19, and on May 21, 1986, both Scott and Newman met with Trump.

By mid-June 1986, the Trump group, after making further investigations decided it was not interested in acquiring Western Pacific. In the words of Edward Trump, the decision not to proceed "wasn't a question of the few dollars. It [Western Pacific] was not a business that we wanted to own."

On June 23, 1986, Chairman Newman informed Western Pacific's board that even though the negotiations with the Trump Group had terminated, the investment community was now aware that Western Pacific was "for sale." Newman recommended, and the board authorized, the investment banking firm of Bear Stearns & Company ("Bear Stearns") to search for a suitable buyer. At the same meeting, the Compensation Committee (acting through two non-employee directors) recommended that the Company enter into termination agreements ("golden parachutes") with two principal executives, Chairman Newman and President Scott. The Committee's recorded reason for doing so was to protect management in the event of a change of control and to ensure that management would be in a position to respond to acquisition proposals that were in the best interest of the shareholders. Thereupon Western Pacific's board, with Messrs. Scott and Newman not participating in the vote, unanimously approved the golden parachutes for Newman and Scott.

In either August or September, 1986, Bear Stearns produced a second buyer for Western Pacific, Gibbons, Green, Van Amerongen ("Gibbons, Green").[1] Gibbons, Green offered to buy Western Pacific for a price of $155.00 per share. Western Pacific's board reviewed the Gibbons, Green offer, obtained a favorable fairness opinion from Bear Stearns (acting as Western Pacific's independent financial advisor) and approved the offer. On September 17, 1986, Western Pacific and Gibbons, Green entered into an agreement for the acquisition of Western Pacific at a price of $155.00 per share, and the parties issued a press release. The announcement of the

agreement precipitated a "bidding war" for Western Pacific involving several new contenders, including Danaher. The bidding ended on October 3, 1986, when Danaher and the board agreed upon Western Pacific's acquisition pursuant to a tender offer for the previously mentioned tender offer price of $163.00 per share followed by a cash-out merger at the same price.

On October 9, 1986, Western Pacific and a wholly-owned subsidiary of Danaher commenced a joint $163.00 per share cash tender offer for all of Western Pacific's stock, to be followed by a cash-out merger at the same price. As a consequence of the response to the tender offer, Danaher became the owner of more than 90% of the stock of Western Pacific.

On October 10, 1986, Kramer filed this suit, styled as a class action. Kramer alleges that he is suing both individually and representatively on behalf of the common stockholders of Western Pacific. Kramer's complaint, as amended, charges defendants Newman and Scott with breach of their fiduciary duty to Western Pacific. Defendants' breach of duty is cast in terms of claims of waste of corporate assets. The two defendants alone, of a board comprised of at least twelve directors, are charged with diverting to themselves eleven million dollars of the Danaher sale proceeds through their receipt of stock options and golden parachutes and with incurring eighteen million dollars of excessive or unnecessary fees and expenses in connection with the sale of Western Pacific.[2]

On December 31, 1986, pursuant to 8 *Del. C.* § 253, the merger was consummated. As a result, by operation of law, Kramer and the remaining Western Pacific stockholders who had not tendered their

---

1. The plaintiff and defendants do not agree as to when Bear Stearns produced Gibbons, Green as a second buyer for Western Pacific. Plaintiff states that Gibbons, Green's interest was revealed in mid-September 1986. Defendants assert that Gibbons, Green came forward in August 1986. While the date is disputed, we find it irrelevant to the disposition of the appeal.

2. Kramer does not dispute the adequacy of the tender offer/merger price. He agrees that the tender offer and merger resulted from a competitive bidding contest and the efforts of Bear,

Stearns. He also concedes that Newman and Scott, given their large stock holdings, would have no reason not to obtain the highest possible price for Western Pacific. His principal contention for sustaining an individual, as distinguished from a derivative, claim is that the effect of the defendants' acts of waste was to reduce the common shareholders' net distributive share of an otherwise adequate tender offer price paid by Danaher for taking Western Pacific private.

shares ceased to be shareholders in exchange for the right to receive $163.00 per share in cash, subject to a right of appraisal under 8 *Del.C.* § 262.

On January 14, 1987, defendants moved to dismiss Kramer's amended complaint. Defendants asserted that as a consequence of the consummated merger, Kramer ceased to be a shareholder of Western Pacific and lost standing to maintain this action under the principles enunciated in *Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984). On September 11, 1987, the Court of Chancery granted defendants' motion, treating it as one for summary judgment. The Court stated, "Well-settled Delaware case law clearly indicates that, as a result of the cash-out merger and plaintiff's failure to challenge the fairness of the underlying merger itself, the plaintiff is without standing to pursue his ... stockholder derivative claims."

On appeal Kramer contends that the Court of Chancery erred as a matter of law in misinterpreting both the amended complaint and the controlling law. Kramer makes two contentions in this appeal: (a) Kramer asserts that the amended complaint alleges wrongs against the contractual rights of the individual shareholders rather than wrongs against the corporate entity; and, alternatively, (b) Kramer argues that the amended complaint's charges against management of acts of waste associated with the sale of the company are tantamount to direct attacks upon the fairness of the merger terms. Hence, Kramer maintains that the cashed-out shareholders of Western Pacific have standing to pursue their claims in individual or class suits, and that the Trial Court erred in ruling to the contrary. We cannot agree.

## II

### A. Nature of Claims Stated

■ The distinction between derivative and individual actions rests upon the party being *directly* injured by the alleged wrongdoing.

The common law countries have devised one of the most interesting and ingenious of accountability mechanisms for large formal organizations: the shareholder's derivative suit. In such a suit, the shareholder sues on behalf of the corporation for *harm done to it.* Ordinarily, therefore, any damages recovered in the suit are paid to the corporation. Historically, the derivative suit was conceived of as a double suit, or two suits in one: The plaintiff (1) brought a suit in equity against the corporation seeking an order compelling it (2) to bring a suit for damages or other relief against some third person who had caused legal injury to the corporation. Shareholders may also bring direct actions, both as individuals and as a class, for *injuries done to them* in their individual capacities by corporate fiduciaries. Recovery, in these individual or class actions goes to the suing shareholders, not their corporation.

R. Clark, *Corporate Law* 639–40 (1986) (emphasis added); *see also* D. Block, N. Barton & S. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors and Officers* at 216 (1987). Thus, to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation. *See Moran v. Household International, Inc.,* Del.Ch., 490 A.2d 1059, 1070, *aff'd,* Del.Supr., 500 A.2d 1346 (1985) ("[t]o set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' or a wrong involving a contractual right of a shareholder ... which exists independently of any right of the corporation") (quoting *Fletcher's Cyclopedia Corps.,* § 5921, at 451 (Perm.Ed., Rev.Vol. 1984) (citations omitted)). For a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation. *See Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 249 (1970).

■ Despite these clear theoretical distinctions between derivative and individual causes of action, "the line of distinction between derivative suits and those brought for the enforcement of personal rights asserted on behalf of a class of stockholders

is often a narrow one...." *Abelow v. Symonds*, Del.Ch., 156 A.2d 416, 420 (1959). Whether a cause of action is individual or derivative must be determined from the "nature of the wrong alleged" and the relief, if any, which could result if plaintiff were to prevail. *See Elster v. American Airlines, Inc.*, Del.Ch., 100 A.2d 219, 221–23 (1953).[3] In determining the nature of the wrong alleged, a court must look to "the body of the complaint, not to the plaintiff's designation or stated intention." *Lipton v. News Int'l, PLC*, Del.Supr., 514 A.2d 1075, 1078 (1986).

Kramer, seeking to avoid loss of standing through merger, has designated his suit as a class action stating individual and not derivative claims. Kramer asserts that the Trial Court misinterpreted the causes of action stated against management when it found them to be derivative claims, thus passing upon the merger to Danaher under *Lewis*. Kramer makes two arguments: (i) that the causes of action pleaded, though constituting claims for waste of assets [$11,000,000 in stock options and termination bonuses and $18,000,000 of excessive fees], worked a *"special"* and *"direct"* injury to the common shareholders' contractual rights that is distinct from any injury to the corporation; and (ii) that the individual defendants' alleged breaches of fiduciary duty directly and adversely affected the merger consideration; hence, the complaint should be construed as an attack on the "fairness" of the *terms of the merger*, which, being individual in nature under *Cede & Co. v. Technicolor Inc.* Del.Supr., 542 A.2d 1182 (1988), survives the merger.

■ Kramer argues that the class sustained an injury when it was "wrongfully deprived" of a "portion of the Merger Sale proceeds." Kramer reasons that since the $29,000,000 unnecessarily spent by management "could only come out of the Sale Proceeds," the class of common shareholders thereby sustained a special injury by the reduction of the amount of their distributive share.[4] However, in our view, the allegations of the amended complaint do not sustain Kramer's characterization of the complaint—that is, as representing either allegedly wrongful acts of management resulting in an injury to the common shareholders that is separate and distinct from that sustained by the corporation as a whole or as a direct attack on the fairness of the terms of the merger.

The claims alleged against Messrs. Newman and Scott are claims of waste of assets from conduct extending over a period of six months or more that are largely unrelated to the Danaher sale. Moreover, the disputed corporate obligations were incurred in response to a series or sequence of events that plaintiff argues, with hindsight, were entirely foreseeable and pre-

---

**3.** The line between derivative and individual actions can become particularly vague in the area of suits challenging defensive takeover tactics. Fortunately, the issues raised in this case do not involve the area of defensive tactics. Although some may view "golden parachutes" as a defensive measure, others view this method of compensation as more a form of insurance for managers. *See* R. Clark, *Corporate Law* at 577 (1987). Moreover, some commentators have argued that golden parachutes actually benefit shareholders because they reduce the personal incentive of target managers to systematically reject takeover bids. *See* Lambert & Larcker, *Golden Parachutes, Executive Decision Making, and Shareholder Wealth*, 7 J. Acc. & Econ. 179 (1985) (empirical study that purports to show a positive security market reaction to the adoption of golden parachute plans); *see also* Note, *Golden Parachutes and the Business Judgment Rule: Toward a Proper Standard of Review*, 94 Yale L.J. 909 (1985).

**4.** In Kramer's view of the facts, management's grant of $11 million in stock options and golden parachutes and $18 million in "excessive" expenditures associated with the sale of the company occurred so close in time to the merger's consummation as to cause a direct injury and loss to the common shareholders in the form of a reduced distribution. Kramer, however, misreads the record. The stock options received by Newman and Scott were approved by the Western Pacific directors in June 1985 and ratified by the Western Pacific shareholders in May 1986. The allegedly excessive fees arose, in part, out of the Gibbons, Green agreement in September 1986. The Western Pacific–Danaher merger was not proposed until late September 1986, after the adoption of all the transactions Kramer presently contests. Kramer's argument implies a conspiracy on the part of the defendants to divert the sale proceeds from the shareholders to the individual defendants and third parties. Such a contention is neither alleged nor supported by the record.

dictable. Because the culminating event was the Danaher going-private transaction, plaintiff treats the six months of expenditures as if incurred simultaneously and attributes them to the ultimate buy-out by Danaher. So construed, plaintiff contends that the expenditures collectively represent a special or direct injury to the common shareholder of Western Pacific as distinguished from an injury to the corporation itself. In our view, plaintiff strains for a result that a reasonable construction of the amended complaint does not support.

The complaint states simply a series of claims of waste of assets (through the payment of unnecessary options, bonuses, fees and expenses) that, by virtue of the timing of payout, are said to result in an illegal diversion of funds from the shareholders in breach of a contract right and the cause of special injury to them.[5] We do not find such allegations to be sufficient to state a claim of special or direct injury to the common shareholders rather than a derivative claim for waste.

Suits against management for waste resulting from excessive payments of corporate funds (whether made to individual defendants or to third parties) do not affect contractual rights of shareholders associated with the ownership of common stock in the sense of altering the ratable distribution of a going private sale.[6] The gravamen of Kramer's complaint is mismanagement resulting in waste of corporate assets and treatment uniformly accorded such allegations is well settled under Delaware law.

■ Delaware courts have long recognized that actions charging "mismanagement which depress[ ] the value of stock [allege] a wrong to the corporation; *i.e.,* the stockholders collectively, to be enforced by a derivative action." *Bokat,* 262 A.2d at 249; *see also Harff v. Kerkorian,* Del.Ch., 324 A.2d 215, 218 (1974), *rev'd on other grounds,* Del.Supr., 347 A.2d 133 (1975). Thus, where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature. *See Elster,* 100 A.2d at 222.

A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.

### B. Claim of Fraud In or Arising From a Merger

■ Kramer alternatively seeks to establish the existence of an individual claim of waste by attacking the "terms" of the merger. Kramer alleges that "defendants Newman and Scott diverted to themselves and others moneys rightfully belonging to the Class, resulting in unfair treatment of the Class."[7] Plaintiff's argument is prem-

---

5. If Newman and Scott exercise their stock options, all common stock shareholders will still ratably participate in the distribution of the sale proceeds because the shares Newman and Scott will receive will be equal to all other shares. The golden parachutes reflect compensation resulting from the termination of Newman and Scott's executive positions, a transaction unrelated to their position as shareholders.

6. It is interesting to note that, outside the area of going-private transactions, all the claims asserted by the plaintiff have consistently been viewed by our courts as derivative in nature. *See, e.g., Bokat,* 262 A.2d at 248–49 (a claim that a majority shareholder caused the corporation to pay excessive fees for the majority's benefit, rather than for proper corporate purpose, held derivative); *Elster,* 100 A.2d at 222 (a claim challenging the grant of stock options held derivative); *Penn Mart Realty Co. v. Perelman,* Del.Ch., C.A. No. 8349, Hartnett, V.C. (Apr. 15, 1987) [available on WESTLAW, 1987 WL 10018] (a claim challenging termination payments held to be derivative in nature).

7. In paragraph 4 of the amended complaint, Kramer alleges that "the per share consideration to be paid to the Class would have been substantially greater if the defendants had not violated their fiduciary duty to the Class of candor, loyalty and due care." In paragraph 5 of the amended complaint, plaintiff asserts that "defendants Newman and Scott diverted money to themselves which rightfully belonged to the Class." However, these assertions do not represent an attack on the merger directly, either fair

ised upon *Cede & Co. v. Technicolor, Inc.,* Del.Ch., C.A. No. 7129, Allen, C. (Jan. 13, 1987) (*"Cede Ch."*) [available on WEST-LAW, 1987 WL 4768], *rev'd in part on other grounds,* Del.Supr., 542 A.2d 1182 (1988) (*"Cede Supr."*).

In *Cede Ch.,* the Court of Chancery held that "cashed-out shareholders who do not seek appraisal are, after the effectuation of the merger, certainly not stockholders, yet clearly such persons have standing to litigate claims of breach of duty arising from the merger." *Cede Ch.,* slip. op. at 11–12 (citing *Rabkin v. Philip A. Hunt Chem. Co.,* Del.Supr., 498 A.2d 1099 (1985); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985); *Weinberger v. UOP Inc.,* Del.Supr., 457 A.2d 701 (1983); *Lynch v. Vickers,* Del.Supr., 429 A.2d 497 (1981)). *Cede Ch.,* and the cases cited therein, are distinguishable. In contrast to the instant case, the cited decisions concerned direct attacks on transactions involving corporate restructuring. As recognized by this Court in *Cede Supr.,* direct attacks against a given corporate transaction (attacks involving fair dealing or fair price) give complaining shareholders standing to pursue individual actions even after they are cashed-out through the effectuation of a merger. Specifically, this Court stated that "[n]o one would assert that a former owner suing for loss of property through deception or fraud has lost standing to right the wrong that arguably caused the owner to relinquish ownership or possession of the property." *Cede Supr.,* 542 A.2d at 1188.

In this case, the focus of Kramer's attack is upon waste through allegedly excessive payments to Newman, Scott, (and unnamed others) incurred prior to the Danaher merger. Newman and Scott's alleged breaches of duty do not implicate the fairness of the merger's terms. Plaintiff does not directly challenge the merger as resulting from a breach of fiduciary duty. *See, e.g., Penn Mart Realty Co. v. Penelman,* Del.Ch., C.A. No. 8349, Hartnett, V.C. (Apr. 15, 1987); *Rosen v. Navarre,* Del.Ch., C.A. No. 7098, Hartnett, V.C. (Oct. 29, 1985). Having not directly attacked the merger,

Kramer's claim of diversion of funds and excessive payments clearly does not rise to an attack on the merger itself sufficient for his suit to survive the merger.

Kramer's position is tantamount to saying that, in the context of a cash-out merger, whenever a shareholder asserts a claim against management for breach of fiduciary duty based upon waste or other acts causing a monetary loss to the corporation, the shareholder's claim should also be construed: (i) as asserting a "special injury" to the shareholder, as distinct from the corporation; and (ii) as amounting to a *direct* attack on the terms of the merger, thus giving the shareholder standing to continue, or bring forward, a suit after merger. Such a position is contrary to well-established principles of Delaware law and cannot be accepted by this Court.

### C. Shareholder Standing to Continue A Post-Merger Derivative Suit

Having found Kramer's claims to be clearly derivative in nature, we turn to the issue of standing. To have standing to maintain a shareholder derivative suit, a plaintiff must be a shareholder at the time of the filing of the suit and must remain a shareholder throughout the litigation. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984). This Court, in *Lewis,* set forth two exceptions in the merger context to its holding that only a current shareholder has standing to maintain an action that is derivative in nature: (i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise. 477 A.2d at 1046 n. 10; *see also Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 249 (1970); *Schreiber v. Carney,* Del.Ch., 447 A.2d 17, 21–22 (1982).

Both exceptions set forth in *Lewis* are clearly inapplicable to this case. Kramer does not contend that the merger was fraudulent, perpetrated merely to deprive Western Pacific of its claim against the

price or fair dealing, but rather an attack on

transactions that arise out of the merger.

defendants; nor does plaintiff assert that Western Pacific has simply been through a reorganization not affecting plaintiff's ownership. Having found the claims asserted by Kramer to be derivative in nature and that Kramer has failed to assert a claim that falls within an exception established in *Lewis*, plaintiff has lost standing to pursue the post-merger claims against the defendants.

### Conclusion

Since plaintiff's claims against the individual defendants are for waste of corporate assets, they are wholly derivative in nature. The amended complaint may not be reasonably construed as alleging a "special injury" suffered by Kramer or his purported class that is different from the indirect injury suffered by all the shareholders of Western Pacific. Kramer also fails to assert a claim of fraud in the merger or to bring his claims within one of the exceptions recognized in *Lewis*. Thus, it necessarily follows that plaintiff has lost standing to pursue the derivative claims stated. Title to such claims has passed by operation of law to Danaher, and Danaher alone has the right to determine whether to pursue such claims against the defendants.

\*   \*   \*   \*   \*   \*

Accordingly, the decision of the Court of Chancery is Affirmed.