ANGLO AMERICAN SECURITY FUND, L.P., Diversified Long Term Growth Fund, L.P., Sterling Grace Capital Management, L.P., Drake Associates, L.P., the Lorraine G. Grace Trust 1487 and Oliver R. Grace Junior Trust 90 II, Plaintiffs,

v.

S.R. GLOBAL INTERNATIONAL FUND, L.P., Sloane Robinson Investment (Cayman), Ltd. and Ernst & Young LLP, Defendants.

C.A. No. 20066–NC.

Court of Chancery of Delaware, New Castle County.

Submitted: April 25, 2003.
Decided: Aug. 4, 2003.

Kurt M. Heyman, Patricia L. Enerio, James Tobia and Christal Lint, of the Bayard Firm, Wilmington; Martin P. Unger, John Gionis and Candace Reid Gladston, of Certilman Balin Adler & Hyman, LLP, East Meadow, NY, of counsel, for Plaintiffs.

Bruce E. Jameson and Allyson A. McKenzie, of Prickett, Jones & Elliott, P.A., Wilmington; Robert A. Cohen and Charles I. Poret, of Dechert, LLP, New York City, of counsel, for S.R. Global International Fund, L.P. and Sloane Robinson Investment (Cayman), Ltd.

Allen M. Terrell, Jr., Daniel A. Dreisbach, Paul D. Brown and James H. McMackin, III, of Richards, Layton & Finger, P.A., Wilmington, for Defendant Ernst & Young, LLP.

## *O P I N I O N*

CHANDLER, Chancellor.

Plaintiffs, Anglo American Security Fund, L.P., Diversified Long Term Growth Fund, L.P., Sterling Grace Capital Management, L.P., Drake Associates, L.P., The Lorraine G. Grace Trust 1487, and Oliver R. Grace Junior Trust 90 II, bring this action against defendants, S.R. Global International Fund, L.P. (the "Fund") Sloane Robinson Investment (Cayman), Ltd., ("Sloane") the general partner of the Fund, and Ernst & Young LLP, ("E & Y") the Fund's independent auditors. Plaintiffs allege that Sloane breached its fiduciary duties to the limited partners of the Fund; that the Fund and Sloane breached the Fund's limited partnership agreement ("Agreement") and were negligent; that E & Y made negligent misrepresentations in the Fund's audited financial statements and aided and abetted Sloane's breach of fiduciary duty; and that all defendants engaged in fraud against the limited partners of the Fund.[1] The defendants challenge the standing of the plaintiffs to bring these claims and have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim and under Court of Chancery Rule 9(b) for failure to state with particularity the circumstances constituting the alleged fraud.

## I. STATEMENT OF FACTS [2]

The plaintiffs each became limited partners of the Fund in or about August 1997,

---

1. In their briefing on this motion, E & Y and plaintiffs address possible claims of breach of contract and breach of fiduciary duty against E & Y. A motion to dismiss such claims is moot, as the claims are not pled in the complaint. *See infra* Part III.B.

2. Unless otherwise specified, all facts supporting and discussed in this opinion are taken from the well-pled allegations of the complaint and the terms of the Agreement, which is integral to the complaint and incorporated therein by reference. *See White v. Panic,* 783

with initial capital investments ranging from over $0.4 million to approximately $11.9 million. The Fund is a Delaware limited partnership created "to serve as a fund through which the assets of its Partners may be utilized" in investing in various types of securities and other financial instruments [3] or to act as what is commonly termed a hedge fund. The Fund establishes in its books a capital account for each partner consisting of the partner's original capital contribution, plus any additional capital contributions, minus any capital withdrawals, and adjusted at the end of each fiscal period for the partner's proportional share of net profits and losses. The Fund is obligated to provide the partners with unaudited quarterly reports and an audited annual financial statement as well as information necessary for federal income tax purposes. Limited partners of the Fund are not permitted to assign their interests without written consent of the general partner and must provide written notice to the Fund thirty business days prior to making any capital withdrawal. Sloane, the general partner of the Fund, is a company organized under the laws of the Cayman Islands. E & Y, the Fund's auditor, is a Delaware limited liability partnership.

As of December 31, 1999, Sloane's capital account in the Fund was credited with $22,350,704 or 15% of the net profits to the limited partners in 1999.[4] On February 18, 2000, Sloane withdrew $22,350,704 from its capital account. The credit to Sloane's capital account was recorded in the Fund's audited 1999 financial statement ("1999 Statement"). The 1999 Statement was provided to the limited partners in March 2000. Although it did report other post-year-end capital contributions and withdrawals as "Subsequent Events," the 1999 Statement did not report Sloane's February 18 withdrawal. This withdrawal was reported in the Fund's quarterly statement for the first quarter of 2000, which statement was received by the limited partners on May 9, 2000.

The plaintiffs take issue with the withdrawal on the bases that (1) the withdrawal overdrew Sloane's capital account because substantial losses sustained by the Fund during January and February 2000 had reduced the available balance in Sloane's capital account below $22,350,704; (2) the Agreement permits the general partner to withdraw funds only on the last day of the month; and (3) the withdrawal should have been disclosed as a Subsequent Event in the 1999 Statement.

## II. STANDARD OF REVIEW

On a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court must assume the truthfulness of all well-pled facts contained in the complaint and view those facts and all reasonable inferences drawn from them in the light most favor-

A.2d 543, 547–48 n. 5 (Del.2001); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del.1995).

3. Limited Partnership Agreement of S.R. Global International Fund, L.P. § 1.03 (as amended Sept. 1, 1997) [hereinafter Agreement]. Under this section the Fund may utilize the partners assets in "holding, selling short, trading and otherwise investing in securities and other financial instruments of any name and nature which exist now or are hereafter created and rights and options related thereto." *Id.*

4. Section 9.01(b) of the Agreement provides that when the net profits exceed net losses in any fiscal year, 15% of the excess is to be debited from the capital accounts of the limited partners and "shall be credited as of the end of the fiscal year to the Capital Account of the General Partner."

able to the plaintiff.[5] In addition, the Court may consider any documents integral to the complaint, that are incorporated by reference therein.[6] Conclusory allegations that are unsupported by facts contained in the complaint, will not be accepted as true.[7] Dismissal is appropriate under Rule 12(b)(6) only when it appears with reasonable certainty that the plaintiff would not be entitled to relief under any reasonable set of facts properly supported by the complaint and any documents incorporated by reference therein.[8]

Although notice pleading is sufficient to survive a motion to dismiss under Rule 12(b)(6), Rule 9(b) requires that the circumstances constituting any alleged fraud be stated with particularity. Conditions of the mind, notably scienter in a fraud claim, may be averred generally.[9]

### III. ANALYSIS

*A. Standing of Plaintiffs*

Defendants move to dismiss all claims on the basis that they are derivative in nature and the plaintiffs do not have standing to bring a derivative claim. Delaware partnership law requires in a derivative action that the plaintiff be a partner (or assignee of one) at the time of bringing the action and at the time of the challenged transaction.[10] The Court is entreated to take judicial notice of Fund records indicating that all plaintiffs had withdrawn from the fund by the time this action was filed. These records are not integral to and are not incorporated by reference into the complaint and the Court has not considered them in ruling on these motions to dismiss.[11] Nonetheless, if I determine that the action is derivative in nature the Court may then consider extrinsic documents presented by the defendants indicating that the plaintiffs lack standing to bring a derivative action, thereby converting the motion to one for summary judgment under Rule 56.[12] Therefore, I now turn to the defendants' argument that the claims in this case are derivative.

 The test for distinguishing direct from derivative claims in the context of a limited partnership is substantially the same as that used when the underlying entity is a corporation.[13] In both instances

---

5. *See Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988) (stating that "upon a motion to dismiss, only well-pleaded allegations of fact must be accepted as true" and that the Court "need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences").

6. *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 612–13 (Del.1996); *Orman v. Cullman,* 794 A.2d 5, 15–16 (Del.Ch.2002).

7. *Grobow,* 539 A.2d at 187 (stating that "conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true").

8. *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985). *See Vanderbilt Income & Growth Assocs.,* 691 A.2d at 613.

9. "Malice, intent, knowledge and other condition of mind of a person may be averred generally." CT. CH. R. 9(b).

10. 6 *Del. C.* § 17–1002.

11. As noted I do not rely on corporate records of the fund, which are extrinsic to the pleadings. I observe but similarly do not rely upon the plaintiffs' concession in their answering brief (also extrinsic to the pleadings) that they have all withdrawn from the fund. Plaintiffs neither concede nor deny that such withdrawal occurred before filing this action.

12. *See Vanderbilt Income & Growth Assocs.,* 691 A.2d at 612–13.

13. *Litman v. Prudential–Bache Props., Inc.,* 611 A.2d 12, 15 (Del.Ch.1992).

the determination is made by careful application of a rather nuanced test.[14] The test looks to the nature of the injury and to the nature of remedy that could result if the plaintiffs are successful.[15] When a plaintiff alleges either an injury that is different from what is suffered by other shareholders (or partners) or one that involves a contractual right of shareholders (or partners) that is independent of the entity's rights, the claim is direct.[16] If the injury is one that affects all partners proportionally to their *pro rata* interests in the corporation, the claim is derivative.[17] In a derivative action the plaintiff sues for an injury done to the partnership and any recovery of damages is paid to the partnership.[18] Conversely, in a direct action the plaintiff sues to redress an injury suffered by the individual plaintiff and damages recovered are paid directly to the plaintiff who was injured.[19] In every case the court must determine from the complaint whether the claims are direct or derivative and may not rely on either party's characterization.[20] Because harm to the entity will almost inevitably harm the stakeholders and because the entity itself is in some ways no more than an amalgamation of a certain subset of stakeholders' interests, differentiation of direct from derivative claims can be elusive.

To further complicate matters, whereas corporations are largely creatures of statute with some limited contractual flexibility, limited partnerships offer greater contractual flexibility with only a few statutory constraints. Consequently, the structure and function of a limited partnership is sometimes analogous to the corporate model with the limited partners having similar rights and responsibilities as corporate shareholders and the general partner acting in much the same capacity as a corporate board of directors—but not necessarily so. Application of corporate law rules to disputes related to a limited partnership necessitates a bit of flexibility.[21] This is true because the facts unique to a limited partnership dispute include the contents of the limited partnership agreement—how it specifies or modifies the entity's function and structure and the rights and responsibilities of the general and limited partners. In his opinion in *In re Cencom Cable Income Partners, L.P. Litigation*, then-Vice Chancellor Steele noted that, "In the partnership context, the relationships among the parties may be so simple and the circumstances so clear-cut that the distinction between direct and derivative claims becomes irrelevant."[22]

---

14. *See In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629 at *3, 2000 Del. Ch. Lexis 10 at *7 (Del. Ch.) (citing Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 9–2(a), at 517 (1998) [hereinafter Wolfe & Pittenger]).

15. *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del.1988); *In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629 at *3, 2000 Del.Ch. Lexis 10, at *7.

16. *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.Ch.1985).

17. *See In re Digex, Inc. S'holders Litig.*, 789 A.2d 1176, 1189 (Del.Ch.2000) (quoting Wolfe & Pittenger § 9–2(a), at 517–18).

18. *Kramer*, 546 A.2d at 351 (quoting R. Clark, Corporate Law 639–40 (1986)).

19. *Id.*

20. *See In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629 at *3, 2000 Del. Ch. Lexis 10, at *7.

21. *Id.* at *2, 2000 Del.Lexis 10, at *6. *See also* Jack B. Jacobs, *Entity Rationalization: A Judges' Perspective*, 38 Bus. Law 1043 (2003).

22. *In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629 at *3, 2000 Del.Ch. Lexis 10, at *8.

Similarly, in some instances, the relationships among the parties and the function and structure of the partnership itself may diverge from the corporate model so dramatically that some claims, which in a corporate context might be classified as derivative, *must* be brought as direct claims in order to enable the injured parties to recover while preventing a windfall to individuals or entities whose interests were not injured.

The essence of the plaintiffs' claims is that Sloane withdrew funds from its capital account in violation of the partnership agreement; that this withdrawal exceeded the balance in the account; and that timely disclosure of the withdrawal was not given to the limited partners. It is undisputed that on February 18, 2000, Sloane withdrew $22,350,704 from its capital account. The plaintiffs contend that this withdrawal breached the Agreement, which permits the general partner to make withdrawals only on the last day of the month. When the 1999 Statement was prepared and distributed to the limited partners, it disclosed (as "Subsequent Events") information about deposits and distributions related to the capital accounts of limited partners that occurred after December 31, 1999, but did not disclose that on February 18, 2000, the general partner withdrew over $22 million from its capital account. Plaintiffs claim that this withdrawal is material because it amounts to the general partner having "bailed out" of the Fund. Indeed, the plaintiffs contend that due to losses sustained by the Fund in January and February 2000, the balance of the capital account of the general partner, as of February 18,

2000, would have been less than the amount that was withdrawn, causing a negative balance in the account. Because the 1999 Statement contained other information of a similar nature (post-year-end withdrawals by limited partners) and because the withdrawal was material, the failure to disclose it in the 1999 Statement rendered the statement materially false and misleading.

The defendants point out that the various claims made by the plaintiffs allege only two distinct types of injury, either diminution in value of the fund or misdisclosure of the withdrawal, each of which constitute derivative rather than direct claims. All claims with respect to the fact of the February 18 withdrawal, according to the defendants, state merely a diminution in value of the Funds assets, which injures the limited partners only in proportion to their *pro rata* interest in the Fund. All claims related to the failure to report the withdrawal in the 1999 Statement, defendants argue, are similarly derivative under the recent Court of Chancery ruling in *Manzo v. Rite Aid Corp.*[23]

### 1. *Diminution of Value of the Fund*

■ Delaware corporate[24] and limited partnership[25] cases have agreed that a diminution of the value of a business entity is classically derivative in nature. In *Cencom*, however, then-Vice Chancellor Steele held that two claims, which "at first appear derivative in nature since the alleged injury devalues the partnership's assets," were nonetheless direct claims due to special circumstances present in the context of that limited partnership.[26] Similarly, for

23. 2002 Del.Ch. Lexis 147 (Del.Ch.).

24. *See, e.g., Behrens v. Aerial Communications, Inc.,* 2001 Del. Ch. LEXIS 80, at *15 n. 17 (Del. Ch.).

25. *See, e.g., Litman,* 611 A.2d at 16–17.

26. 2000 WL 130629 at *4, 2000 Del.Ch. Lexis 10, at *12.

reasons, discussed below, I conclude that the operation and function of the Fund as specified in the Agreement diverge so radically from the traditional corporate model that the claims made in the complaint must be brought as direct claims.

*Cencom* provides an instructive analytical framework for categorizing the claims at issue here. That opinion held that "superimposing derivative pleading requirements ... serves no useful or meaningful public policy purpose" in the context of certain narrow factual situations that may arise with respect to an alternative (non-corporate) entity.[27] The court identified two discernable purposes for classifying claims as derivative: (1) to ensure that any remedy accrues to the entity that sustained the injury but does not confer benefits on wrongdoers nor provide windfalls to the uninjured and (2) to provide a gatekeeping function that will both promote corporate resolution of internal problems and deter strike suits.[28] Because, in *Cencom*, (1) there was no ongoing conduct (the partnership being in liquidation); (2) the only two parties to the partnership (the class of limited partners and the general partner) were clearly adversaries in the pending litigation; and (3) the claims had proven to be sufficiently meritorious to survive a motion for summary judgment, the court determined that imposition of derivative requirements would impede efficient and final resolution of the claims and would simply "make[ ] no sense." [29]

Due to the structure and operation of the Fund, whenever the value of the Fund is reduced, the injury accrues irrevocably and almost immediately to the current partners but will not harm those who later become partners. Although other types of injuries could harm the Fund as an entity in ways that appropriately could be challenged in a derivative action,[30] injuries that result in a direct reduction of the Fund's assets will effect an almost immediate reduction in the capital accounts of each of the existing partners. Such losses confer only a fleeting injury to the Fund, one that is immediately and irrevocably passed through to the partners. When an injured partner withdraws from the partnership, the partner's capital account has already been diminished by any and all diminutions of value to the Fund from the time of entering the partnership until the time of withdrawal. There are no successors in interest to partners so injured because there are no "shares" sold to someone else, any withdrawing partner's interest in the entity is liquidated. Any recovery obtained by the Fund in a derivative action cannot provide a remedy to wronged former partners nor to their (non-existent) successors in interest. If additional partners are later admitted, they suffer no injury from previous reductions in the value of the fund because their capital accounts will reflect the full amount of their initial investments adjusted only for events occurring after their admission as part-

27. *Id.* at *3, 2000 Del.Ch. Lexis 10 at *9.

28. *Id.* at *4, 2000 Del.Ch. Lexis 10 at *13–17.

29. *Id.* at *4, 2000 Del.Ch. Lexis 10 at *13.

30. For example, if the general partner violated § 3.03 of the Agreement and invested in a company for the purpose of exercising control, thereby possibly exposing the Fund to liability as a controlling shareholder, this theoretically could form the basis of a claim that may be derivative in nature. Similarly, if the general partner were to engage in some (perhaps illegal) activities that led to restrictions being placed on the Fund's ability to engage in certain types of potentially beneficial investment transactions, the harm would accrue more directly to the Fund as an entity. Any harm to the investors would be indirect and would cease when an investor withdrew from the Fund. Such a scenario suggests another theoretical basis for a derivative claim.

ners. Such newly admitted limited partners would receive a windfall if the Fund were to recover damages for diminution of Fund value prior to their admission as limited partners. Characterizing the plaintiffs' claims as derivative would thus have the perverse effect of denying standing (and therefore recovery) to parties who were actually injured by the challenged transactions while granting ultimate recovery (and therefore a windfall) to parties who were not.[31] This result is antithetical to the first purpose of derivative litigation identified in *Cencom*, does nothing to further the gatekeeping functions of derivative litigation requirements, and, in the words of Vice Chancellor Steele, "makes no sense." I hold that the plaintiffs' claims related to Sloane's February 18, 2000, withdrawal are direct claims.

### 2. *Misdisclosure in the 1999 Statement*

■ In support of their contention that claims related to non-disclosure of the withdrawal in the Fund's 1999 Statement are derivative, the defendants argue that if the plaintiffs' allegations were true, the plaintiffs have alleged, as did the plaintiff in *Manzo*, only that they "experienced an injury suffered by all [investors] in proportion to their pro rata ownership interest."[32] At first blush, *Manzo* appears to be apposite. The plaintiff in *Manzo* challenged omissions and false disclosures in annual financial statements and other information disclosed to the Securities Exchange Commission, the shareholders, and the public over a period of three years.[33] The specific injury alleged was unclear, but the plaintiff suggested that the misdisclosures resulted, at the very least, in depriving her and a class of similarly situated shareholders of accurate financial information upon which to base decisions to buy, sell, or hold shares in the corporation.[34] The Court held in *Manzo* that this injury was shared equally by *all* stockholders and any injury would derive to them only in proportion to their *pro rata* ownership interest and did not implicate any contractual right of shareholders that was not similarly a right of the corporation as a whole.[35] Therefore the claim was derivative. Here, plaintiffs allege that at least one effect of the two-month delay in disclosing to the limited partners that the general partner had bailed out of the Fund was to deprive the limited partners of the same opportunity to "cut their losses" promptly before the value of the Fund's investments declined further. Nonetheless, the structure and function of the Fund, as described in the terms of the Agreement, is so dissimilar to the corporate structure in which the *Manzo* claims were brought, that the reasoning and policy of that opinion are inapposite to the claims made in the complaint and, in any event, the disclosure claim seems to implicate a contractual right of the limited partners that is not similarly a right of the Fund itself.

31. Although limited partners admitted to partnership after the injury would not have standing to bring a derivative claim because they were not partners at the time of the challenged transaction, 6 *Del. C.* § 17–1002, they would reap the rewards if the claim were brought derivatively by a limited partner that did have standing because the recovery would derive to the Fund and, therefore, to all of the partners in proportion to their *pro rata* interests.

32. Op. br. of S.R. Global Int'l Fund & Sloane Robinson Inv., at 7 (quoting *Manzo*, 2002 Del.Ch. Lexis 147, at *18) (alteration and misquotation in original).

33. *Manzo*, 2002 Del.Ch. Lexis 147, at *4 & n. 1.

34. *Id.* at *18.

35. *Id.* at *18–19.

Under the terms of the Agreement, the limited partners have absolutely no control over the governance and management of the Fund; the limited partners are entitled to very limited routine disclosures regarding the activities and performance of the Fund; the limited partners' interests in the Fund are not freely transferable or tradable; the liquidity of the limited partners' investment is somewhat restricted and, perhaps, most importantly for purposes of this motion to dismiss, the Fund exists solely to utilize "the assets of its Partners" in various investment vehicles and maintains its books to account separately for the value of each partner's assets at all times. The Fund operates more like a bank with the individual partners each having accounts—albeit accounts that are not federally insured or afforded virtually any regulatory protections against loss of the assets invested. This is not a typical corporate business venture in which the value to the investors is based not only upon the physical assets of the entity but also upon the speculative value of the entity as a going concern. Other than a general partner's interest in management fees, there is no going-concern value. Yet, the limited partners have no capacity to replace a general partner that fails properly to represent the limited partners' interests. The only alternative available to a dissatisfied limited partner is to withdraw from the Fund.

Even the choice of withdrawing is impossible to implement instantaneously because the Agreement provides that limited partners may withdraw only on the last day of the month and only after giving thirty business days notice. This is six weeks at a minimum. The Fund is designed for the purpose of engaging in some highly speculative investments. This can be very rewarding as the partners found in fiscal year 1999 and highly risky as was discovered in 2000. In every event, such investments tend to be highly volatile and a delay of six or more weeks in withdrawing one's funds from such a vehicle can lead to massive changes to the value of the account from the date the decision is made to withdraw until the funds may actually be withdrawn.

The plaintiff limited partners each appear to be sophisticated parties that understood and voluntarily accepted the terms of the Agreement and assumed the risks of investing in the Fund in order potentially to reap the rewards of undertaking such risks. As such, these sophisticated investors reasonably expected that the general partner would fulfill at least the obligations it voluntarily accepted under the Agreement and as a fiduciary. As the defendants correctly point out, Section 12.05 of the Agreement specifies the obligations of the general partner to report to the limited partners—unaudited quarterly reports of the fund performance, an audited financial report annually, and a year-end report to each partner indicating the necessary gain and loss information for Federal income tax purposes. Thus, the 1999 Statement was contractually required to be provided to the partners and any claims that it was incomplete, or materially false or misleading would state a direct claim.

*B. Claims Not Made in the Complaint*

The characterization of which counts of the complaint allege which wrongful acts against which defendants is inconsistent among the Complaint and the various briefs filed in this motion.

For example, E & Y's Opening Brief in Support of Its Motion to Dismiss, appears to interpret the complaint as alleging breach of contract and breach of fiduciary duty against E & Y. Apparently, such allegations are inferred from allegations that

E & Y "bore a contractual duty to the Fund as to which the limited partners, including plaintiffs, are third party beneficiaries,"[36] and "bore a fiduciary duty and a duty of due care to the Fund and its limited partners, including plaintiffs"[37] in conjunction with the general statement that the "action arises from the negligence, gross recklessness, breach of fiduciary duty, breach of contract and fraud of all defendants."[38] The complaint, however, clearly specifies that the "omissions and the conduct of *the Fund* and defendant *Sloane Robinson* described in the complaint constituted a breach of contract and, in the case of *Sloane Robinson,* a breach of its fiduciary duties to the limited partners, including plaintiffs."[39] The preceding paragraph alleges that the alleged acts and omissions of *all defendants, including E & Y,* were "performed and transacted negligently and carelessly and with a reckless disregard for the consequences thereof."[40]

In their answering brief, the plaintiffs disavow allegations of breach of fiduciary duty by E & Y—only that E & Y aided and abetted Sloan's alleged breach of fiduciary duty—but argue that breach of contract is alleged against E & Y. Parties may not amend the pleadings through briefing on a motion to dismiss.[41] If the breach of contact claim is not pled in the complaint, any motion to dismiss it is moot.

Upon a thorough reading of the complaint, including the passages quoted above, it clearly does not allege that E & Y *breached* any contract, or for that matter any fiduciary duty. Thus, E & Y's motion to dismiss claims of breach of fiduciary duty and breach of contract are both moot because, even though the complaint alleges that E & Y *owed* both fiduciary and contractual duties to the plaintiffs, it is not alleged that E & Y *breached* either of those duties.

### C. Motions to Dismiss Under Court of Chancery Rule 12(b)(6)

As discussed with respect to the analysis of whether the complaint states direct or derivative claims, the complaint alleges two basic types of misconduct: (1) wrongful withdrawal from the Fund of $22,350,704 by Sloan and (2) inadequate and untimely disclosures to the limited partners regarding that withdrawal. This misconduct is alleged to give rise to various claims including breach of the partnership agreement (contract), breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, negligent misrepresentation, and fraud.[42]

With the exception of the fraud claim, discussed below, all claims need only meet the rather forgiving notice pleading standard of Court of Chancery Rule 8[43] in

36. Compl. ¶ 53.

37. *Id.* ¶ 54.

38. *Id.* ¶ 1.

39. *Id.* ¶ 65 (emphasis added).

40. *Id.* ¶ 64.

41. *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 Del.Ch. Lexis 144, at *41 (Del.Ch.); *Orman,* 794 A.2d at 28 n. 59.

42. In addition, Count VI alleged conversion and unjust enrichment against Sloane. The

plaintiffs' state in their answering brief that this claim has been abandoned.

43. Rule 8(a) states that:

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the party deems itself entitled. Relief in the alternative or of several different types may be demanded.

CT. CH. R. 8(a). In addition, Rule 8(e) directs parties to make averments that are "simple,

order to state a claim and survive a motion to dismiss under Rule 12(b)(6). Defendants contend that the various counts fail to meet this standard for the following reasons: (1) the damages pled are too speculative; (2) there is no sufficient causal link established between the wrongs alleged and the injury claimed; (3) defendants had no contractual or legal duty to disclose the withdrawal at the time it was made; (4) the Agreement contains an exculpatory provision and the plaintiffs have not alleged any bad faith; and (5) the aiding and abetting claim fails because the plaintiffs do not allege knowing participation by E & Y. I address in turn why each of these arguments is unavailing.

 With respect to all claims,[44] defendants assert that the complaint relies on a forbearance theory of damages that is unreasonably speculative. Particularly, E & Y stresses that plaintiffs claim damages stemming from their reliance on inaccurate financial statements or delayed disclosure of Sloane's withdrawal, which resulted in the defendants failing to withdraw or delaying withdrawal of their contributions to the Fund. E & Y then contends that, "To survive a motion to dismiss, each of the claims for relief asserted by Plaintiffs require the pleading *and proof* of a damage element ...."[45] This misstates the standard of review on a motion to dismiss under Rule 12(b)(6).[46] Plaintiffs allege with respect to each claim made in the complaint that monetary damages were suffered in excess of $9.5 million, which the plaintiffs assert will be proven at trial.[47] Proof of these damages and of their certainty need not be offered in the complaint in order to state a claim.

 The defendants propose that the causative link between the wrongs alleged and the damages claimed is inadequately pled. In part this amounts to a rehash of the arguments made that the claims are derivative and not direct because Sloane's withdrawal of funds, even if wrongful, improperly reduced the Fund's value and did no direct harm to the plaintiffs. As explained above, I do not agree. The complaint alleges that Sloane impermissibly withdrew over $22 million from the Fund, which exceeded the balance then available for withdrawal and amounted to the general partner bailing out of the fund,[48] and then wrongfully failed to disclose the fact, amount, or implications of the withdrawal

---

concise, and direct" and adds that technical formality is not a requirement in either pleadings or motions. *Id.* at 8(e).

44. This includes the fraud claim against all defendants. Because fraud is subject to special pleading requirements, the pleading of damages with respect to the alleged fraud is separately discussed later in this opinion.

45. E & Y Op. Br. at 27 (emphasis added).

46. In support of this innovative pronouncement, E & Y offers three cases, *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001); *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983); *Winston v. Mandor,* 710 A.2d 835, 840 (Del.Ch.1997), and a restatement section, Restatement (Second) of Torts § 552 (1965). These citations appear merely to state the elements of various claims made in the complaint, and damages is certainly an element of each of the claims. None, however, provides any support for the idea that proof must be provided at the pleading stage.

47. Damages in the amount of $500,000 were alleged to have been suffered with respect to Count VI, but as noted earlier, the plaintiffs disavow any intent to pursue this further as a separate claim.

48. It appears from the language of the Agreement that if Sloane withdrew all of its capital account balance, this may have constituted the "retirement" of the General Partner under § 5.02(c). It is inappropriate, however, at this stage to make any findings on proper construction of the terms of the Agreement.

in the 1999 Statement. If these allegations are true, and I accept for purposes of ruling on this motion that they are, the withdrawal of funds in excess of those rightly available to Sloane would cause financial harm to all other partners. In addition, if the general partner bailed out of the fund but failed to notify the limited partners for almost a full quarter, there are many factual scenarios, which may be proven at trial, that would result in financial harm to the limited partners. For now it is enough that the complaint alleges that this behavior was wrongful and caused the plaintiffs financial harm in the amount stated.

 Next, the defendants assert that there was no contractual or legal obligation, either under the Agreement or Delaware law, mandating immediate disclosure of Sloane's withdrawal from its capital account. This may be true, but it is not what the plaintiffs allege was required. The plaintiffs allege that Sloane made the withdrawal after the end of the calendar year but before the release of the annual audited financial statement. That same audited financial statement did disclose post-year-end contributions and withdrawals in the capital accounts of limited partners. Accordingly, it is alleged that the failure to report Sloane's withdrawal, while reporting similar transactions by limited partners, rendered the 1999 Statement materially false and misleading. The Agreement requires, in § 12.05, that an audited financial statement be provided to the partners promptly after the end of the year. Under Delaware law, fiduciaries are required, at the very least, to be honest and truthful when communicating with their principals.[49] These allegations, therefore, state a claim.

 Sloane also invokes § 3.04 of the Agreement to shield itself from liability for breach of fiduciary duty and negligence. Section 3.04(a) exculpates the general partner from liability "for honest mistakes in judgment[,] for losses due to such mistakes[, and] for the negligence of [the Fund's agents]." It is impossible to determine at this stage of the litigation whether the breach of fiduciary duty and negligence claims are subject to exculpation under this provision. The complaint alleges that the withdrawal was made during a time period when the Fund was sustaining significant losses. It also alleges that this rather substantial withdrawal was not disclosed in the 1999 Statement even though similar transactions in the limited partners' accounts were disclosed. It is reasonable to infer from this that the circumstances surrounding the withdrawal and the decision when to disclose it may indicate some degree of bad faith on the part of Sloane or the other defendants. Until a factual record is developed, a determination of the applicability of the exculpatory provision to the claims would be premature.

 Finally, E & Y asserts that the aiding and abetting claim must be dismissed for failure to allege knowing participation. Plaintiffs insist that the audited financial statement, prepared by E & Y, failed to disclose a material transaction by the general partner but did disclose similar transactions by limited partners. The complaint alleges that the information reported in the 1999 Statement and the audited annual statement for 2000 report a course of events different from that reflected in the Fund's internal accounting records. These allegations provide a sufficient basis for the Court to infer that the auditors preparing the financial statements knew of the discrepancies and knowingly

---

**49.** *See Malone v. Brincat,* 722 A.2d 5, 10–11 (Del.1998).

participated in the preparation of audited financial statements that were not reflective of the Fund's internal accounting records. If there is some reason that E & Y did not believe that this was a breach of the general partner's and the Fund's fiduciary duties to the limited partners, it may proffer evidence on that subject at trial.

The defendants' motions to dismiss Counts I–V for failure to state a claim are denied.

### D. Motion to Dismiss Fraud Claims

■■■■ Under Court of Chancery Rule 9(b), the circumstances constituting any alleged fraud must be pled with particularity. In order to state a claim of common law fraud, the complaint must allege: (1) a false representation of fact (or material omission) by the defendant; (2) with the knowledge or belief that the representation is false or with reckless indifference to its truth or falsity; (3) intent to induce the plaintiff's reliance; (4) actual and justifiable reliance; which results in (5) harm to the plaintiff. The second and third elements, because they relate to conditions of the mind, may be averred generally.[50]

#### 1. False Representation or Omission of Material Fact

■■■ The Agreement requires that the Fund supply all partners with an annual audited financial statement. The complaint alleges that Sloane hired E & Y to prepare the 1999 Statement. The 1999 Statement is alleged to be false and misleading because it failed to disclose as a Subsequent Event the fact that Sloane had withdrawn over $22 million from its capital account in February 2000, although other Subsequent Events disclosed in the 1999 Statement included withdrawals by limited

partners from their capital accounts. This information is alleged to have been material because it is alleged that the amount withdrawn exceeded the current balance in Sloane's capital account and therefore amounted to the general partner bailing out of the Fund at a time when the Fund was sustaining significant losses. The first element of fraud is adequately pled.

#### 2. Knowledge, Belief, or Reckless Disregard of Falsity

■■■ The complaint alleges in general terms that all defendants knew or believed the 1999 Statement was materially false and misleading or acted with reckless disregard for its truth. In addition, the factual allegations support this assertion. Sloane's withdrawal was made on February 18, 2000. The 1999 Statement was given to the partners sometime in March of 2000. Although evidence following discovery may prove otherwise, it is reasonable to infer that the withdrawal was made and recorded in the corporate books before the completion of the 1999 Statement. Thus, Sloane and the Fund would have had knowledge of the withdrawal before the issuance of the audited annual statement. In addition, E & Y should have had knowledge of the withdrawal through its careful inspection of the corporate accounting records before certifying the audited 1999 Statement. Because post-year-end withdrawals from limited partners' accounts were reported in the 1999 Statement it appears that all defendants knew or believed that transactions of this type were appropriately reported as Subsequent Events. When a financial statement selectively reports some, but not all, of a particular type of transaction, it is reasonable to infer that those responsible for the prepa-

---

**50.** "Malice, intent, knowledge and other condition of mind of a person may be averred generally." Ct. Ch. R. 9(b)

ration of the report know it to be misleading or have acted with reckless disregard of whether the report presents an accurate picture. The second element of fraud is adequately pled.

### 3. *Intent That Plaintiffs Rely on Misrepresentation*

■ The limited partners of the Fund, including the plaintiffs, were entitled to one and only one audited financial statement each year. The general partner was entrusted with making a wide range of innovative and highly speculative investments of the partners' invested assets. The only reasonable inference is that all defendants were aware of these facts and any suggestion that, in the face of such stark realities, the defendants may not have intended that the partners rely on the information contained in the 1999 Statement is preposterous. The third element of fraud is adequately pled.

### 4. *Actual, Reasonable Reliance*

■ Perhaps it is fair simply to accept that sophisticated investors of millions of dollars did in fact rely on the one piece of audited financial information received each year from the Fund. It is certainly a reasonable inference that they did so. Yet, Rule 9(b) requires the circumstances surrounding any alleged fraud to be pled with particularity and the plaintiffs fail to plead even so much as an assertion that they read or considered the contents of the 1999 Statement. Whether and how plaintiffs relied upon the 1999 Statement seems to be the type of information that would be particularly within the control of the plaintiffs. The conclusory allegation that "Plaintiffs were in fact deceived by the acts, omissions and conduct described in this complaint and relied thereon to their detriment"[51] is glaringly insufficient to meet the particularity requirement of Rule 9(b). The fourth element of fraud is inadequately pled to meet the requirements of Court of Chancery Rule 9(b).

### 5. *Resultant Harm to Plaintiffs*

■ The complaint alleges that as a result of the defendants' fraud, plaintiffs suffered damages in excess of $9.5 million. This is a "particular" enough amount of money even for Rule 9(b) purposes. What is missing, however, are particular facts from which the Court and the defendants can understand how the alleged fraud caused this injury. Since the plaintiffs' reliance on the alleged misrepresentation is averred nonspecifically, it is unsurprising that the next logical step linking reliance to the resulting injury is similarly glossed over in the complaint. It is not enough for the plaintiffs to complain that the defendants knowingly failed to disclose an important matter and then jump directly to the observation that the plaintiffs believe that collectively they are now $9.5 million dollars short in their assets. The fifth element of fraud is not pled with adequate particularity.

Count VII is dismissed against all defendants for failure to allege the circumstances of the alleged fraud with the particularity required by Court of Chancery Rule 9(b).

### IV. CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss Counts I–V for failure to state a claim are DENIED; defendants' motions to dismiss Count VI is MOOT because the Court accepts the plaintiffs' representation in their answering brief that this claim will not be pursued; the defendants' motions to dismiss

---

51. Compl. ¶ 80.

Count VII for failure to state a claim of fraud with adequate particularity is GRANTED.

IT IS SO ORDERED.