# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IAC SEARCH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11774-CB |
| | ) | |
| CONVERSANT LLC (f/k/a | ) | |
| VALUECLICK, INC.), | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  September 20, 2016
Date Decided:  November 30, 2016

Robert S. Saunders, Ronald N. Brown, III, and Matthew P. Majarian of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Plaintiff*.

Matthew E. Fischer, Timothy R. Dudderar, Christopher N. Kelly, and Andrew H. Sauder of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendant*.

**BOUCHARD, C.**

In January 2014, IAC Search, LLC paid $90 million to purchase six subsidiaries of ValueClick, Inc. The terms of the transaction are set forth in a Stock and Asset Purchase Agreement dated December 8, 2013 (the "Agreement").

In this action, IAC asserts that ValueClick fraudulently induced IAC to overpay for one of the subsidiaries (Investopedia) by providing IAC with false information concerning Investopedia's ad sales during the due diligence process. Although the Agreement contains express representations concerning certain financial results and traffic metrics for Investopedia, IAC's grievance is not based on those representations but is premised instead on other information IAC received during due diligence that the parties chose not to incorporate into an express contractual representation. Apart from its fraud claim, IAC asserts that ValueClick breached various provisions of the Agreement relating to the other subsidiaries it acquired.

ValueClick has moved to dismiss all but one of IAC's claims for failure to state a claim for relief. For the reasons explained below, I conclude that most of IAC's contract claims state claims for relief, but that IAC's fraud claim does not.

The most significant claim at issue is the fraud claim, which offers IAC the prospect of seeking damages beyond the indemnification cap in the Agreement. Resolution of that claim turns on application of this Court's precedents addressing anti-reliance clauses in purchase agreements. Applying those precedents, I find

1

that certain provisions of the Agreement add up to a clear disclaimer of reliance on extra-contractual statements that bars IAC's claim for fraud.

## I.  BACKGROUND

The facts in this opinion are drawn from the Amended Verified Complaint ("Complaint") and documents incorporated therein.[1]

### A.  The Parties

Plaintiff IAC Search, LLC ("IAC") is a subsidiary of IAC/InterActiveCorp, a publically traded media and internet conglomerate that specializes in the areas of search and applications, online dating, media, and e-commerce. IAC is a Delaware limited liability company with its principal offices in New York, New York.

Defendant ValueClick, Inc. ("ValueClick"), which is now known as Conversant LLC, is a Delaware corporation headquartered in Plano, Texas. It offers digital advertising and marketing services to advertisers.

---

[1] The incorporated documents, all of which are referenced or quoted in whole or in part in the Complaint, are attached as exhibits to the Transmittal Affidavit of Andrew H. Sauder ("Sauder Aff.") that was submitted in support of ValueClick's motion to dismiss. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted) ("a plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

**B.      Components of the Transferred Group's Revenue Data**

Under the Agreement, IAC purchased the stock of six subsidiaries of ValueClick:  ValueClick, AB, a Swedish company; ValueClick Brands, Inc., a Delaware corporation; Pricerunner Denmark Aps, a Danish company; Investopedia, LLC, a Delaware limited liability company ("Investopedia"); ValueClick Korea, Inc., a California corporation; and Value Click Canada, Inc., a Canadian corporation (the "Transaction").  These six entities are referred to in the Agreement and herein as the "Transferred Group."[2]

The Transferred Group's websites generate revenue by selling and placing internet advertisements mainly in the form of "display ads" shown to users browsing a particular website.  The $90 million transaction price allegedly was driven largely by the future revenue streams expected from the Transferred Group's display ad revenues.

Two metrics are used to calculate a website's total display ad revenue:  (1) the number of "display ad impressions" and (2) the cost charged for them.  A display ad impression is an advertisement shown to a particular webpage visitor. The number of display ad impressions measures the number of times an advertisement was shown to browsers.  The cost-per-mille ("CPM") is the amount

_____

[2] *See* Am. Compl. ¶¶ 19-21; Sauder Aff. Ex. 1 ("Agreement") at 1.

3

of advertising revenue generated for every 1,000 display ad impressions. A website's total display advertising revenue is calculated by multiplying the number of ad impressions by the CPM, and then dividing the product by 1,000.

In the ordinary course, advertisers purchase ad space on a website directly from the website's owner. These are known as premium ads. A website often cannot sell all of its available ad space. The unsold space, known as "remnant" inventory, is sold through third-party advertising networks that facilitate the last-second auction of remnant ads to advertisers bidding in real time. Advertisers generally pay less for remnant ads than they do for premium ads and thus the CPM for remnant ads is generally lower than for premium ads. The higher the percentage of low-earning remnant ads versus high-earning premium ads as a share of a website's total ad impressions, the lower the total ad revenue will be. If a website sees the same amount of traffic, but its owner sells more of its inventory directly as premium advertising, total revenue will be higher than if the inventory is sold as remnant ads.

### C.    The Alleged Investopedia Fraud

IAC alleges that ValueClick falsified performance metrics regarding Investopedia's remnant ad revenue. According to IAC, ValueClick made these misrepresentations during the due diligence process in documents placed in the

4

electronic data room and in statements ValueClick made in response to IAC's diligence requests in a system known as the "Diligence Tracker."

More specifically, IAC alleges that ValueClick overstated the volume of Investopedia's remnant display ad impressions and understated its remnant CPM. This had the effect of giving IAC the mistaken impression that Investopedia was generating unusually low earnings per view compared to what IAC had achieved for similar businesses. IAC asserts that it was fraudulently induced into purchasing Investopedia with the illusion of a major opportunity to increase future revenue flows by bringing Investopedia's performance in line with that of IAC's other websites. Unlike IAC's other claims, this claim is not subject to the $8 million indemnity cap in the Agreement, which excludes damages for fraud.[3]

D.     **The Alleged Misrepresentations Concerning the Third Party**

Before the Transaction, the Transferred Group allegedly used email marketing to drive traffic to websites employing the advertising services of a third party (the "Third Party"). These marketing emails contain an advertisement that, when clicked on, directs users to those websites. The terms and conditions governing the use of the Third Party's advertising services are set forth in an agreement between one of the companies in the Transferred Group (ValueClick

---

[3] *See* Agreement § 8.5(b)(i) (exempting from aggregate indemnity cap damages for fraud, intentional misrepresentation or intentional breach by ValueClick).

Brands, Inc.) and the Third Party (the "Third Party Contract"). According to IAC, ValueClick's use of email marketing violated the Third Party Contract and its associated policies, which, in turn, caused ValueClick to breach a representation in Section 3.27 of the Agreement.

In support of this claim, IAC points to two e-mails between ValueClick and the Third Party dated December 6 and 17, 2013. In the December 6 email, a representative of the Third Party notified ValueClick that the Third Party is "very concerned" about "seeing [a] high volume of referral traffic campaigns going to [ValueClick] sites for specific keywords, when there is a limited amount of search results for that keyword," and that "there have been advertiser complaints about misleading email marketing campaigns that drive users to one of [ValueClick's] sites."[4]

The same representative followed up on December 17, stating in an e-mail that the issues regarding misleading keywords had not been resolved and that the Third Party's traffic quality team is—

> —still seeing campaigns going to landing pages where the articles offered aren't answering the user's original question (and therefore being deemed 'irrelevant.'). It seems like the content being created is contextually relevant, but if there is a specific string of keywords that

---

[4] Sauder Aff. Ex. 3.

6

hone in on a specific area, I want to make sure the answer to the user's question is provided in the organic results articles.[5]

The representative offered an example of a keyword search that directed users to an irrelevant site:

> [I]f a user searches 'What is the value of old coins', a candofinance ad shows up that says 'Old Coins Value – Search Online for Value & Worth of Old Coins'. <u>The articles that it leads</u> to all give the user information about selling the coins, but none of them actually help them determine what the value or worth of the old coin is (some highlight that knowing the value is important, but not how the [sic] determine the value). So the user's original question is never answered with the content.[6]

The representative then appeared to suggest that the use of email marketing was not permitted under the Third Party's policies:

> 3) Email – When reviewing the policies closer and the specific language around referral traffic, I found that referral traffic needs to be from an ad on a site, and that email marketing wouldn't be included within potential referral traffic sources. If you could please work with your teams to make sure that referral traffic that is driving searches with [Service 1] calls on your sites are from ads on sites, that would be appreciated.[7]

On January 3, 2013, one week before the Transaction closed, ValueClick provided IAC with a declaration of Steve Neufer, then President of ValueClick, in which he stated that "[a]t all times during the term of the [Third Party Contract], I

---

[5] Sauder Aff. Ex. 4.

[6] *Id.*

[7] *Id.*

7

believe that [ValueClick] acted in good faith and complied with the requirements of the [Third Party Contract]." [8] Neufer further declared that it was his understanding that the Third Party Contract "contemplated the use of email traffic," an understanding "informed by the parties' course of conduct." [9] A copy of the December 17 email was attached to the Neufer declaration, which characterized that email as a "shift in [the Third Party's] policy and course of dealing with [ValueClick]." [10] The December 6 email was not discussed in or attached to the Neufer declaration.

On January 9, 2014, the day before the Transaction closed, Neufer emailed a representative of the Third Party indicating that he had directed ValueClick personnel to "continue [the] status quo on email traffic" and suggesting that ValueClick was prepared to "wind down" its use of e-mail marketing:

> Thanks for the call today. While you guys continue to work this through, I have asked our folks to continue status quo on email traffic (with an emphasis on **no** increase in volume) until I receive either a schedule for an orderly wind down or notice of a hard stop from the Policy Team. Let me know if you have any concerns with this approach. [11]

---

[8] Sauder Aff. Ex. 5 ¶ 3.

[9] *Id.* ¶¶ 4-5.

[10] *Id.* ¶ 9.

[11] Sauder Aff. Ex. 6.

Section 7.3(a) of the Agreement obligated ValueClick to provide to IAC in connection with the closing of the Transaction a certificate, signed by a duly authorized officer of ValueClick, affirming that the representations in Section 3.27 of the Agreement "shall be true and correct in all respects, both when made and as of the Closing Date." ValueClick did not satisfy this requirement. Instead, the officer's certificate it provided to IAC, which was signed by ValueClick's Chief Financial Officer (the "Officer's Certificate"), carved out Section 3.27 from the representations to which it affirmed compliance.[12] In essence, the Officer's Certificate repeated the substance of the Neufer declaration, *i.e.,* that ValueClick believed "email marketing was permitted under [the Third Party Contract] as of the date of the Agreement," and that the December 17 e-mail "indicates that [the Third Party] is changing its policy with respect to email traffic."[13]

### E. The Alleged Misrepresentations Concerning Financial Statements

IAC alleges that certain financial statements ValueClick provided to IAC were misstated because they failed to accurately reflect several transactions that materially altered the financial position of the Transferred Group. The Complaint identifies three such transactions, which are discussed below. IAC asserts that

---

[12] Sauder Aff. Ex. 1.

[13] *Id.* ¶ 4.

9

ValueClick never disclosed any of these transactions to IAC, or the errors and omissions in accounting for them.

### F. Procedural Posture

IAC filed this action on December 7, 2015, and amended its complaint on February 29, 2016. The Complaint contains seven claims, one for fraud and six for breach of the Agreement. On March 15, 2016, ValueClick moved to dismiss all of these claims, except Count II, under Court of Chancery Rules 9(b) and 12(b)(6).

## II. ANALYSIS

When considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court "should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[14] Under Court of Chancery Rule 9(b), fraud must be "pled with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[15]

---

[14] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[15] Del. Ch. Ct. R. 9.

## A. The Agreement Bars IAC's Fraud Claim

In Count I of its Complaint, IAC asserts that ValueClick fraudulently induced IAC to overpay for Investopedia by providing IAC with false data relating to Investopedia's remnant ad sales. IAC does not challenge the accuracy of any of the financial disclosures concerning Investopedia set forth in Schedule 3.7(a) of the Agreement, or any of the traffic metrics for Investopedia set forth in Schedule 3.23 of the Agreement, both of which are the subject of express contractual representations.[16] IAC's fraud claim is premised instead on the accuracy of information concerning Investopedia provided to IAC during due diligence that the parties chose not to incorporate into an express representation or warranty in the Agreement.

ValueClick argues that the Agreement, which is governed by Delaware law,[17] prohibits IAC from asserting a claim for fraud based on alleged representations made to IAC during due diligence that are not expressly included

---

[16] *See* Agreement § 3.7(a) (making various representations concerning the financial statements attached as Schedule 3.7(a)); § 3.23 (representing the accuracy and completeness of, among other things, traffic metrics set forth in Schedule 3.23).

[17] Agreement § 10.8.

11

in a representation or warranty in the Agreement.[18]  Three provisions of the

Agreement are relevant to this analysis:  Sections 3.31, 4.7, and 10.6.

In Section 3.31 of the Agreement, ValueClick as the "Seller" disclaimed

making any extra-contractual representations:

> Neither the Seller nor any of its Affiliates or Representatives is
> making any representation or warranty of any kind or nature
> whatsoever, oral or written, express or implied (including but not
> limited to, any relating to financial condition, results of operations,
> assets or liabilities of the Transferred Group), except as expressly set
> forth in this Article III, as modified by the Disclosure Schedules, and
> the Seller hereby disclaims any such other representations and
> warranties.

In Section 4.7 of the Agreement, IAC as the "Buyer" acknowledged that

ValueClick was not making any representation concerning information provided

during due diligence unless such information was included in an express

representation and warranty in the Agreement:

> The Buyer is a sophisticated purchaser and has made its own
> independent investigation, review and analysis regarding the
> Transferred Group and the transactions contemplated hereby, which
> investigation, review and analysis were conducted by the Buyer
> together with expert advisors, including legal counsel, that it has
> engaged for such purpose. **The Buyer acknowledges that neither
> the Seller nor any of its Affiliates or Representatives is making,
> directly or indirectly, any representation or warranty with respect**

---

[18] ValueClick also asserts that IAC failed to plead fraud with particularity and that the damages it suffered as a result of ValueClick's fraud are speculative.  I do not reach these issues because the provisions of the Agreement that add up to an anti-reliance disclaimer are dispositive of IAC's fraud claim.

**to any data rooms, management presentations, due diligence discussions, estimates, projections or forecasts involving the Transferred Group, including, without limitation, as contained in the Confidential Information Packet dated August 2013 and any other projections provided to Buyer, unless any such information is expressly included in a representation or warranty contained in Article III**. Nothing in this Section 4.7 is intended to modify or limit any of the representations or warranties of the Seller set forth in Article III.[19]

I refer to this provision as the "Buyer's Acknowledgement Clause."

Finally, Section 10.6 of the Agreement contains a standard integration clause defining the universe of writings that make up the parties' agreement by which IAC acquired the Transferred Group from ValueClick:

> This Agreement (including the Exhibits and Schedules hereto), the Ancillary Agreements and the Confidentiality Agreement constitute the entire understanding and agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the parties with respect to the subject matter hereof and thereof.

Whether a purported disclaimer of extra-contractual representations may shield a seller from fraud claims is the subject of a considerable body of case law in this Court. Writing as a Vice Chancellor, Chief Justice Strine explained in *Abry Partners V, L.P. v. F & W Acquisition LLC* that "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not

---

[19] Agreement § 4.7 (emphasis added).

relieve a party of its oral and extra-contractual fraudulent representations."[20]

Continuing, he explained that to bar such claims:

> The integration clause must contain language that can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. This approach achieves a sensible balance between fairness and equity—parties can protect themselves against unfounded fraud claims through explicit anti-reliance language. If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners.[21]

The *Abry* decision attempted to balance the law's natural abhorrence of fraud and the "strong American tradition of freedom of contract, [a] tradition [that] is especially strong in our State, which prides itself on having commercial laws that are efficient."[22]

Last year, in *Prairie Capital III, L.P. v. Double E Holding Corp.*, Vice Chancellor Laster explained that "Delaware law does not require magic words" to disclaim reliance, and that the specific language of an agreement may vary but still "add up to a clear anti-reliance clause."[23] The Vice Chancellor went on to find that

---

[20] 891 A.2d 1032, 1059 (Del. Ch. 2006).

[21] *Id.* (citations omitted).

[22] *Id.* at 1059-60.

[23] 132 A.3d 35, 51 (Del. Ch. 2015).

14

the combination of a standard integration clause and a clause representing "affirmatively" what information a buyer relied on, as opposed to one "framed negatively," barred fraud claims based on extra-contractual statements.[24]

More recently, based on a review of *Abry* and this Court's later decisions in *Prairie Capital* and *Anvil Holding Corp.*,[25] I explained in *FdG Logistics LLC v. A&R Holdings, Inc.* that, in order to bar fraud claims, a disclaimer of reliance "must come from the point of view of the aggrieved party," meaning that it must come from the *buyer* who is asserting the fraud claim.[26] An assertion from the *seller* "of what it was and was not representing and warranting" is not sufficient given the law's abhorrence of fraud.[27]

Here, the critical language in the Agreement that comes from the perspective of the buyer is the Buyer's Acknowledgement Clause in Section 4.7. In that provision, IAC expressly acknowledged that ValueClick was not "making, directly or indirectly, any representation or warranty" with respect to any information it

---

[24] *Id.*

[25] *Anvil Holding Corp. v. Iron Acquisition Co., Inc.,* 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013) (finding that a standard integration clause and a disclaimer from the *seller* did not "reflect a clear promise by the Buyer that it was not relying on statements made to it outside of the Agreement to make its decision to enter into the Agreement").

[26] 131 A.3d 842, 860 (Del. Ch. 2016).

[27] *Id.*

received in due diligence "unless such information is expressly included in a representation and warranty" in the Agreement. Significantly, this provision is substantively identical to the "critical provision" that the Court in *Abry* found to "define what information the Buyer relied upon in deciding to execute the Agreement."[28] The *Abry* provision stated, in relevant part, that:

> Acquiror acknowledges and agrees that neither the Company nor the Selling Stockholder has made any representation or warranty, express or implied, as to the Company or any Company Subsidiary or as to the accuracy or completeness of any information regarding the Company or any Company Subsidiary furnished or made available to Acquiror and its representatives except as expressly set forth in this Agreement.[29]

Similar to the above provision from *Abry*, the Buyer's Acknowledgement Clause here defines in precise terms from IAC's perspective as the buyer the universe of information on which IAC relied and did not rely when it entered into the Agreement through IAC's express acknowledgement that ValueClick was making no representation about information provided during due diligence, except as

---

[28] 891 A.2d at 1041.

[29] *Id.* In a footnote argument, IAC attempts to distinguish the provision in *Abry* on the theory that it operates "retrospectively as a promise that neither seller '***had made*** any representation or warranty' in the due diligence process" while the clause at issue here "is written in the present tense." Pl's Ans. Br. at 29-30 n.9. This argument is meritless. By its plain terms, the Buyer's Acknowledgement Clause operates retrospectively by encompassing due diligence materials (including "any data rooms, management presentations, due diligence discussions, estimates, projections or forecasts involving the Transferred Group") that necessarily were provided to IAC before it signed the Agreement.

otherwise provided in an express representation in the Agreement.  As the Court explained in *Prairie Capital*, it is not necessary that such a provision be "framed negatively" in terms of what the buyer did not rely on; it is sufficient if the contract states affirmatively what the buyer did rely on.  The Buyer's Acknowledgement Clause here, like the similar provision in *Abry*, does that.[30]

As IAC notes, Section 7.8 of the agreement in *Abry* contained an additional clause not present in the Buyer's Acknowledgement Clause, in which the buyer further acknowledged that the seller would not be liable to the buyer for misstatements made during due diligence:

> … neither the Company nor the Selling Stockholder shall have or be subject to any liability to Acquiror or any other person resulting from the distribution to Acquiror, or Acquiror's use of or reliance on, any such information or any information, documents or material made available to Acquiror in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with the transactions contemplated hereby.[31]

Although this "release" clause reinforces the limiting effect of the acknowledgement provision in the *Abry* agreement, and its absence here makes

---

[30] During oral argument, IAC suggested that an earlier draft of the Agreement contained a negative disclaimer from the buyer that was removed from the final document.  *See* Tr. at 59 (Sept. 20, 2016).  Apart from the fact that a negative disclaimer is not essential to bar fraud claims for extra-contractual statements, as discussed above, this point was not included in IAC's Complaint or its brief, and thus any argument based on it is waived. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[31] 891 A.2d at 1041.

17

this case a closer call than *Abry*, the combined effect of the Buyer's Acknowledgement Clause and the integration clause in Section 10.6 of the Agreement nonetheless add up in my opinion to a clear anti-reliance clause to bar fraud claims based on extra-contractual statements made during due diligence. That is because the integration clause defines the universe of writings reflecting the terms of IAC's agreement to purchase the Transferred Group, and the Buyer's Acknowledgement Clause explains in clear terms from the perspective of the buyer the universe of due diligence information on which IAC did and did not rely when it entered into the Agreement.

It is a basic axiom of contract law that every provision of a contract should be interpreted to have a purpose.[32] Recognizing that its interpretation of the Agreement must adhere to this fundamental principle, IAC argues that the Buyer's Acknowledgement Clause "at most . . . means that IAC may not sue ValueClick for *breach of contract*, or seek contractual indemnification, on account of ValueClick's fraud relating to the Investopedia remnant ad metrics."[33] I disagree.

---

[32] *See, e.g.*, *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (citations omitted) ("When interpreting a contract, this Court will . . . constru[e] the agreement as a whole and giv[e] effect to all its provisions."); *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013) (same); *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013) ("Courts also attempt to give meaning and effect to each word in a contract, assuming that the parties would not include superfluous verbiage in their agreement.").

[33] Pl's Ans. Br. at 29.

The integration clause in the Agreement already bars contract claims based on "all prior written agreements" not listed in Section 10.6 as well as "all prior and contemporaneous oral agreements,"[34] and Sections 8.2 and 8.7 of the Agreement already exclude fraud as a ground for indemnification from the seller.[35] IAC's theory would render the Buyer's Acknowledgement Clause duplicative of these provisions, contrary to basic principles of contract construction.[36] The Buyer's Acknowledgement Clause, moreover, does not distinguish between fraud and breach of contract. If the plain language of the Buyer's Acknowledgement Clause eliminates, as IAC concedes it does, ValueClick's liability for breach of contract arising from extra-contractual misstatements, and does not specify particular categories of liability that are exempted by its operation, it stands to reason that it would eliminate all forms of liability for those misstatements.

---

[34] *See,e.g.*, *Addy v. Piedmonte*, 2009 WL 707641, at *9 (Del. Ch. Mar. 18, 2009) ("Clauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of integration."); *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736, at *7 (Del. Ch. July 11, 2007) (dismissing breach of oral obligation claim because "nothing is alleged in the Complaint to suggest that the integration clause does not properly bar certain oral commitments the Defendants made prior to execution of the Acquisition Agreement").

[35] *See* Agreement § 8.2 (enumerating grounds for indemnification from seller), § 8.7 (excluding claims for fraud from "exclusive remedy" of indemnification).

[36] *See, e.g.*, *Zimmerman*, 62 A.3d at 691 (courts assume that parties would not include "superfluous verbiage" in an agreement).

Finally, it bears remembering that as much as this Court's jurisprudence is informed by a strong public policy against fraud, it also is informed by the equally important policy of respecting freedom of contract. IAC, a multi-billion dollar internet company, affirmatively represented that it is a "sophisticated purchaser" that had made its "own independent investigation" concerning the Transferred Group with the assistance of "expert advisors" before entering into the Agreement.[37] IAC procured for itself in the Agreement express representations concerning the accuracy of certain Investopedia financial information and traffic metrics, about which it brings no claim. And, as explained above, IAC agreed to language in the Agreement that defines what information it did and did not rely on when it executed the Agreement. To permit IAC to now assert a fraud claim against ValueClick, based on Investopedia data provided during due diligence but never made the subject of an express representation in the Agreement, would, to borrow Chief Justice Strine's words, "excuse a lie made by [IAC] in writing" that ValueClick made no such extra-contractual representations.[38] For this reason, and the others explained above, Count I is dismissed for failure to state a claim for relief.

---

[37] Agreement § 4.7.

[38] *Abry*, 891 A.2d at 1058.

## B. The Third Party Claims[39]

The Complaint includes three claims for breach of contract concerning ValueClick's use of email marketing to drive traffic to advertising services provided by the Third Party. Two of these claims (Counts III and IV) are asserted under Section 3.27 of the Agreement. The third claim (Count VI) is asserted under Section 5.1(i) of the Agreement.

In Section 3.27 of the Agreement, ValueClick as the "Seller" made the following representations:

> Since May 15, 2013 and through the Closing Date, Seller has, and all members of the Transferred Group have, complied in all material respects with (i) the terms and conditions of all contracts listed on Schedule 5.15 of the Disclosure Schedules, and (ii) the general business-related policies and procedures governing the business relationship between the party listed on Schedule 3.27(ii) of the Disclosure Schedules or its subsidiaries and their contractual counterparts.

The Third Party Contract is the only one listed on Schedule 5.15 and the Third Party is the only one listed on Schedule 3.27(ii). Thus, Section 3.27 of the Agreement is only relevant to ensuring ValueClick's compliance with the Third Party Contract and the business-related policies of the Third Party during the specified period.

---

[39] The Third Party Contract is governed by California law. Sauder Aff. Ex. 2 ("Third Party Contract") § 17.5. The parties did not present any argument in their briefs based on California contract law, and relied instead on principles of Delaware contract law when addressing the sufficiency of claims based on the Third Party Contract. Accordingly, I do the same for purposes of this decision.

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[40] "Proof of [alleged] damages and of their certainty need not be offered in the complaint in order to state a claim."[41]

IAC has satisfied the first and third elements for Counts III, IV, and VI. It has pled the existence of the Agreement as the basis for each of these claims, and it has sufficiently alleged "resultant damage" on the theory that IAC overpaid to acquire the Transferred Group due to ValueClick's alleged breach of the representations it made in Section 3.27 and the covenant it undertook in Section 5.1(i). The sufficiency of the Complaint's allegations with respect to the second element—the alleged breach of an obligation imposed by the Agreement—is considered below for each of IAC's asserted claims concerning the Third Party.

---

[40] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[41] *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003).

**1.     Count III Fails to State a Claim for Breach of Section 3.27 of the Agreement with respect to ValueClick's Compliance with Section 2.2(a) of the Third Party Contract.**

In Count III, IAC asserts that ValueClick breached the representation it made in Section 3.27 of the Agreement because "ValueClick used email marketing to drive traffic to the Third Party's advertising services despite that doing so was not permitted by the Third Party Contract."[42]   The Complaint identifies only one provision of the Third Party Contract that ValueClick allegedly breached in this respect:  Section 2.2(a).[43]

Section 2.2(a) of the Third Party Contract states that, "[a]fter the launch of any [Advertising Services], for the remainder of the Term, [the Third Party] will make available and [ValueClick] will implement and maintain each of the [Advertising Services] on each of the Sites and Approved Client Applications." Section 2.2(a) does not mention email marketing, and IAC has not offered any explanation how the plain language of this provision, which appears only to allocate post-launch responsibilities between the Third Party and ValueClick, was breached by virtue of ValueClick's alleged use of email marketing.[44]  Nor does the

---

[42] Pls' Ans. Br. at 42 (citing Am. Compl. ¶¶ 82-90).

[43] Am. Compl. ¶ 84.

[44] Indeed, IAC admitted it could not point to any language in the Third Party Contract that prohibits e-mail marketing.  Tr. at 102 (Sept. 20, 2016).

Complaint allege that ValueClick otherwise failed to "implement and maintain" the advertising services it promised to perform under Section 2.2(a).  Accordingly, Count III fails to state a claim for breach of Section 3.27 of the Agreement relating to ValueClick's compliance with Section 2.2(a) of the Third Party Contract.

> **2.  Count IV States a Claim for Breach of Section 3.27 of the Agreement with respect to ValueClick's Compliance with the Third Party's Policies.**

In Count IV, IAC asserts that ValueClick violated "Third Party policies, as specifically prohibited by the Third Party Contract."[45]  IAC advances two theories by which ValueClick allegedly breached the representations it made in Section 3.27 concerning the Transferred Group's compliance with the Third Party's policies.

The first theory follows from ValueClick's representation in Section 3.27(i) that all members of the Transferred Group complied during the relevant period in all material respects with the terms and conditions of the Third Party Contract.  In that regard, the Complaint alleges that ValueClick and the Transferred Group breached Section 2.3 of the Third Party Contract, which required them "to adhere to the Third Party's policies barring keyword abuse."[46]

---

[45] Pls' Ans. Br. at 42 (citing Compl. ¶¶ 91-95).

[46] Am. Compl. ¶ 92.  Section 2.3 of the Third Party Contract required ValueClick to "use Referral Sources to drive traffic to Results Pages . . . subject to the conditions in Exhibit

24

The second theory follows from ValueClick's representation in Section 3.27(ii) that all members of the Transferred Group complied during the relevant period in all material respects with "the general business-related policies and procedures governing" their business relationship with the Third Party. Relatedly, Section 2.2(c) of the Third Party Contract required ValueClick Brands, Inc. to implement and maintain the Advertising Services in accordance with the Third Party's "Branding" and "Program" Guidelines.

The same factual allegations underlie both theories. IAC alleges that ValueClick violated the Third Party's policies by using "keywords to trigger results pages that were not consistent with, or relevant to or accurately descriptive of the Referral Sources or Search Queries . . . used to acquire the traffic."[47] It also alleges that ValueClick "hosted landing pages containing content that was insufficiently relevant or of no relevance at all to a particular Referral Source or Search Query, and purchased certain keywords without the licenses or approvals required to do so," also in violation of the Third Party's policies.[48]

---

C" of the Third Party Contract. Exhibit C, in turn, required that "[e]ach Referral Source" satisfy certain conditions "as reasonably determined" by the Third Party. Third Party Contract at 15.

[47] Am. Compl. ¶ 92.

[48] *Id.* ¶ 93.

As further evidence that ValueClick violated the Third Party's policies, the Complaint references the December 6, 2013 and December 17, 2013 emails, discussed previously, which fall within the period relevant to Section 3.27, *i.e.*, between May 15, 2013 and the closing of the Transaction on January 10, 2014. The December 6 email noted "concerning patterns around keyword and landing pages and advertiser complaints about misleading email marketing campaigns."[49] In the December 17 email, a representative of the Third Party more pointedly suggested that the use of email marketing was not permitted under its policies.[50] The Complaint also plausibly alleges that ValueClick's refusal to provide to IAC an Officer's Certificate at the closing of the Transaction attesting to ValueClick's compliance with Section 3.27 of the Agreement amounts to an admission that its representations in Section 3.27 were false.[51] In sum, although it is not clear precisely which policies of the Third Party allegedly were violated, the foregoing allegations of the Complaint, taken together, easily satisfy the reasonable

[49] *Id.* ¶ 94 (quoting the December 6 email). More specifically, the text of the December 6 email reveals that the Third Party found "high volumes" of referral traffic going to ValueClick's sites for "specific keywords, when there is only a limited amount of search results for that keyword," and discusses advertiser complaints about "misleading email marketing campaigns that drive users to [ValueClick] sites." Sauder Aff. Ex. 3 at 2. The email noted that "[o]ur traffic quality team is very concerned that they are still seeing these patterns and hearing these complaints from advertisers." *Id.*

[50] *See supra* § I.D, text accompanying notes 5-7.

[51] Am. Compl. ¶ 95.

26

conceivability standard to state a claim for breach of Section 3.27 with respect to ValueClick's compliance with the Third Party's policies.

Apart from taking issue with the substance of IAC's factual allegations, which is improper on a motion to dismiss,[52] ValueClick implies that IAC waived its right to assert a claim under Section 3.27 by accepting the Officer's Certificate and proceeding to close the transaction. This argument is without merit.

Under Section 10.3 of the Agreement, a "waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such party." Section 10.3 further provides that "[n]o action taken pursuant to this Agreement … shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein." But ValueClick does not contend that IAC ever executed and delivered a written waiver as Section 10.3 requires, and it fails to explain how IAC's acceptance of the Officer's Certificate, which reasonably could be viewed as an act "taken pursuant to Agreement," could amount to a waiver

---

[52] *See, e.g., BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *6-7 (Del. Ch. Aug. 3, 2004) (inappropriate to decide questions of fact on motion to dismiss).

when Section 10.3 says the opposite. *i.e.*, that any such action shall not "be deemed to constitute a waiver … of compliance with any representation …."[53]

For the reasons explained above, Count IV states a claim for relief.

### 3. Count VI States a Claim for Breach of Section 5.1(i) of the Agreement.

ValueClick covenanted in Section 5.1(i) of the Agreement not to "extend, modify or amend in any material respect, . . . or waive any material benefit under" the Third Party Contract. IAC asserts in Count VI of the Complaint that ValueClick breached these obligations by "agreeing not to expand the Transferred Group's email marketing business."[54] For support, IAC points to Neufer's January 9, 2014 email, which was sent the day before the Transaction closed. It states: "I have asked our folks to continue status quo on email traffic (with an emphasis on **no** increase in volume) until I receive either a schedule for an orderly wind down or notice of a hard stop from the Policy Team."[55]

---

[53] Relying on Section 2.2 of the Agreement, ValueClick asserts that "closing can occur *only after satisfaction or waiver of all closing conditions*." Def.'s Op. Br. at 34. Although compliance with Section 3.27 "as of the Closing Date" was a condition of closing, the Agreement also expressly provides that Section 3.27 is one of the "Fundamental Representations" that "shall survive indefinitely" after the closing. *See* Agreement §§ 7.3(a), 8.1.

[54] Am. Compl. ¶ 118.

[55] Sauder Aff. Ex. 6.

ValueClick responds that Section 17.7 of the Third Party Contract requires that "[a]ny amendment must be in writing signed by both parties and expressly state that it is amending this Agreement," and that IAC has not alleged any facts suggesting that this requirement was met. Although that appears to be correct, drawing all reasonable inferences in IAC's favor at this stage of the case, as I must, Count VI states a claim for relief. In particular, the references to an "orderly wind down" and "hard stop" in Neufer's January 9 e-mail can be read to support IAC's theory that ValueClick was prepared to waive a right it previously believed it had to use e-mail marketing.[56] At a minimum, a factual dispute exists on this issue that cannot be resolved at the pleadings stage.[57] Accordingly, Count VI states a claim for relief.

### C. Count V States a Claim for Breach of Section 3.7 of the Agreement.

IAC asserts in Count V of the Complaint that ValueClick breached Section 3.7 of the Agreement. In Section 3.7, ValueClick represented and warranted, among other things, that: (a) certain "Financial Statements" attached as Schedule 3.7(a) "fairly present, in all material respects, the consolidated financial position

---

[56] Tr. at 80-81 (Sept. 20, 2016).

[57] *See, e.g.*, *BAE*, 2004 WL 1739522, at *6-7 (Del. Ch. Aug. 3, 2004) (inappropriate to decide questions of fact on motion to dismiss).

. . . of the Transferred Group," that (b) ValueClick and the members of the Transferred Group each maintained "accurate books and records that in all material respects reflect their respective assets and liabilities," and that (c) "[t]here are no debts, liabilities or obligations . . . of the Transferred Group . . . required to be reflected or reserved against on a consolidated balance sheet of the Transferred Group" other than those "incurred . . . after the date of the Balance Sheet but on or before the date of this Agreement."

ValueClick argues that Count V fails to state a claim for relief because the Complaint's allegations are too conclusory and because IAC has failed to plead that it suffered any loss recoverable under the Agreement. These arguments fail.

At this stage of the case, IAC need "only give the defendant fair notice of a claim."[58] It has done so. The Complaint identifies and quantifies three allegedly non-conforming balance sheet items:

- A claimed $93,000 receivable from a customer (Flash IT) that was uncollectible because Flash IT was insolvent.

- A $101,000 liability in the form of payments one member of the Transferred Group (ValueClick Brands, Inc.) owed to a third party during the pre-closing period that was not reflected in ValueClick's books and records.

---

[58] *Cent. Mortg. Co.*, 27 A.3d at 536.

- A $58,000 payment an affiliate of a Transferred Group member owed that was not reflected in ValueClick's books and records.[59]

Two of these items reflect liabilities not reflected in ValueClick's books and records even though it is reasonably conceivable that they should have been, and the third reflects a receivable on paper that allegedly was uncollectable in reality. These facts are sufficient to support a reasonable inference that the representations made in Section 3.7 of the Agreement were breached.

As to ValueClick's second line of attack, even though a plaintiff need not offer proof of damages in its pleading to state a claim for relief,[60] the Complaint alleges "at a minimum" $252,000 in damages from the alleged financial misrepresentations.[61]

For the reasons explained above, Count V states a claim a relief.

### D. Count VII States a Claim for Indemnification

IAC asserts in Count VII that ValueClick breached Section 8.2 of the Agreement, which requires ValueClick to ". . . indemnify and hold harmless [IAC] and its Affiliates . . . from and against any and all losses, damages, liabilities, deficiencies, claims . . . to the extent resulting from . . . any breach or failure to

---

[59] Am. Compl. ¶ 104.

[60] *See Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003).

[61] Am. Compl. ¶ 110.

perform any covenant or agreement" contained in the Agreement. Count VII is entirely derivative of the claims in the Complaint (Counts II-VI) asserting that ValueClick breached the Agreement. Because Count II is not subject to the present motion to dismiss, and because the motion to dismiss the breach of contract claims in Counts IV, V, and VI will be denied for the reasons explained above, Count VII survives as well.

## III.   CONCLUSION

For the foregoing reasons, IAC has failed to state a claim for relief with respect to Counts I and III of the Complaint. Accordingly, ValueClick's motion to dismiss is GRANTED with respect to those two claims, but is otherwise DENIED with respect to Counts IV, V, VI, and VII of the Complaint.

**IT IS SO ORDERED.**