# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WINDY CITY INVESTMENTS )
HOLDINGS, LLC, )
　 )
Plaintiff, )
　 )
v. ) C.A. No. 2018-0419-MTZ
　 )
TEACHERS INSURANCE AND )
ANNUITY ASSOCIATION OF )
AMERICA f/k/a TEACHERS )
INSURANCE AND ANNUITY )
ASSOCIATION-COLLEGE )
RETIREMENT EQUITIES FUND, )
　 )
Defendant. )

## MEMORANDUM OPINION

Date Submitted:  February 13, 2019
Date Decided:  May 31, 2019
Date Revised: July 26, 2019

David E. Ross and Eric D. Selden, ROSS, ARONSTAM & MORITZ LLP, Wilmington, Delaware; K. Winn Allen, Kasdin M. Mitchell, Holly R. Trogdon, Rebecca W. Forrestal, KIRKLAND & ELLIS LLP, Washington, D.C.; *Attorneys for Plaintiff*

Michael A. Pittenger, Jennifer C. Wasson, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Mary Eaton, Zeh Ekono, Le-Ahn Bui, WILKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendant*

**ZURN, Vice Chancellor**

The parties to this case dispute the meaning of a complex earn-out provision. The plaintiff and defendant, both in the financial services industry, agreed that the defendant would buy one of the plaintiff's independent mutual fund and advisory firms. That firm held approximately $221 billion under management at the time. The parties settled on an initial payment of $6.25 billion, along with an earn-out of up to $278 million payable to the plaintiff.

The parties now dispute the earn-out amount due to the plaintiff. They have not come to this Court for a final ruling on the amount itself. The purchase agreement subjects that decision to an impartial referee process. Instead, they clash on how to read the contractual variables in the earn-out calculation. The plaintiff brought this case to obtain a declaratory judgment and specific performance on contractual terms to guide the referee's process, as well as specific performance on a contractual books and records dispute.

The defendant moved to dismiss, claiming that it offers the only reasonable understanding of the earn-out and records provisions, and that the plaintiff failed to state its claims. I disagree with the defendant and deny the motion to dismiss. The earn-out provision is susceptible to more than one interpretation at this early stage. In addition, I find that the plaintiff has adequately pled its other claims.

# I. BACKGROUND

I draw the relevant facts from the allegations in, and those documents incorporated by reference into, the Verified Complaint (the "Complaint").[1] At the motion to dismiss stage, I presume well-pled allegations to be true.

### A. The Parties Agree To A Purchase Agreement With An Earn-Out Structure.

Plaintiff Windy City Investments Holdings, LLC ("Windy City") is a Delaware limited liability company. Prior to April 2014, Windy City owned Nuveen Investments, Inc. ("Nuveen"), an independent mutual fund and advisory firm with approximately $221 billion under management at the time. "Nuveen's core business included managing, marketing, and distributing investment funds on behalf of individual and institutional clients."[2] Defendant Teachers Insurance Annuity Association of America ("TIAA") is a New York financial services organization that sells and markets financial products.

In late 2013, the parties began negotiating a sale of Nuveen to TIAA. The negotiations culminated in a term sheet on February 10, 2014, and a purchase

---

[1] Docket Item ("D.I.") 1. I refer to briefing on the Motion to Dismiss as the Opening Brief, the Answering Brief, and the Reply Brief. *See* D.I. 11-12, 21, 29. I refer to the transcript of the February 13, 2019 hearing on the Motion to Dismiss as the Hearing Transcript. *See* D.I. 38.

[2] Compl. ¶ 2.

2

agreement on April 13, 2014 (the "Purchase Agreement").[3]  In addition to an initial payment of $6.25 billion, the parties agreed to an earn-out plan (the "Earn-Out"). Under that plan, Windy City could receive an additional cash payout based on Nuveen's profitability.

The Earn-Out period ran to January 31, 2018.[4]  The Earn-Out amount is based on performance benchmarks derived from two variables:  cumulative advisory revenues ("Advisory Revenues") and cumulative net flows ("Net Flows").  Section 1.8(b) of the Purchase Agreement defines those terms, respectively, as:

---

[3] Windy City includes allegations of the drafting history behind the Purchase Agreement, but, at this stage, I decline to consider that history.  *See id.* ¶¶ 29-37.

[4] Purchase Agreement § 1.8.

"Cumulative Advisory Revenue" means the cumulative advisory revenues of the Subject Companies, from and including January 1, 2015 through and including December 31, 2017, derived from all assets managed or distributed by the Subject Companies,[5] provided that "Cumulative Advisory Revenue" shall (i) include only 50% of the cumulative advisory revenues of the Subject Companies derived from assets that are advised by TIAA-CREF[6] or products that are distributed through TIAA-CREF captive channels (except as otherwise provided in Section 1.8(c)) and (ii) exclude all cumulative advisory revenues of the Subject Companies derived from general account assets of TIAA-CREF.

. . . .

"Cumulative Net Flows" means the amount, if any, of the excess of all Additions to assets under management by the Subject Companies over Withdrawals from assets under management by the Subject Companies (excluding (a) in each case any increase or decrease in assets under management resulting from market appreciation or depreciation, and (b) dividends and distributions (as Withdrawals), but including reinvestments of dividends and distributions (as Additions)), from and including January 1, 2015 through and including December 31, 2017, provided that "Cumulative Net Flows" shall (i) include only 50% of assets added or withdrawn that are third-party assets advised by TIAA-CREF or third-party products distributed through TIAA-CREF captive channels and (ii) exclude all assets added or withdrawn that are general account assets of TIAA-CREF.

---

[5] Although this decision refers to a purchase of Nuveen, Windy City technically sold TIAA another entity, Windy City Investments, Inc., which in turn owned Nuveen. The Purchase Agreement refers often to the "Subject Companies," which it defined as Windy City Investments, Inc., its subsidiaries, and its successors or assigns. *See* Purchase Agreement 138. The parties agree that the "Subject Companies," for purposes of this action, means Nuveen. *See* Compl. ¶ 8 n.8; Opening Br. 6 n.5.

[6] "TIAA-CREF" refers to Teachers Insurance and Annuity Association - College Retirement Equities Fund. *See* Purchase Agreement 139. Windy City alleges that TIAA, the buyer in the Purchase Agreement, was formerly known as Teachers Insurance and Annuity Association – College Retirement Equities Fund. *See* Compl. 1; Answering Br. 1. The parties do not assert any meaningful distinction between TIAA-CREF and TIAA.

The Earn-Out amount is calculated based on Nuveen's Advisory Revenues and Net Flows relative to floor and cap performance targets. For Advisory Revenues, the floor target was $3.15 billion and the cap target was $3.375 billion.[7] For Net Flows, the floor target was $10 billion and the cap target was $22 billion.[8] Windy City would receive a contribution under the Earn-Out if Nuveen's Advisory Revenues or Net Flows met the corresponding floor target. The amount of that contribution increased until Nuveen hit the corresponding cap target.

The Purchase Agreement calculated the Earn-Out contributions using formulas established in Section 1.8(b)'s definitions for the "Cumulative Advisory Revenue Payment Amount" and "Cumulative Net Flows Payment Amount." Under those definitions, if Nuveen met or cleared the unadjusted floor targets for each variable, Windy City was due (i) at least $20 million, and up to $125.1 million, for the Advisory Revenues Payment Amount, and (ii) at least $25 million, and up to $152.9 million, for the Net Flows Payment Amount.[9] The maximum Earn-Out payment equaled a total of $278 million.

The Purchase Agreement also defines a number of levers to raise or lower the Earn-Out amount. The floor and cap targets could be adjusted "[i]n the event of

---

[7] Purchase Agreement § 1.8(b).

[8] *Id.*

[9] Compl. ¶¶ 46, 51.

acquisitions or divestitures" from non-TIAA affiliated parties.[10] Section 1.8(c)(iii) explains that if Nuveen acquired or divested investment advisory businesses or assets from or to a party not affiliated with TIAA, the targets should "be adjusted upward (in the case of an acquisition) or downward (in the case of a divestiture)."[11] And if TIAA sold, transferred, or disposed of all or substantially all of the businesses or assets of Nuveen, Windy City would receive the maximum Earn-Out payment.[12]

On the other hand, the Purchase Agreement did not alter the Earn-Out calculation based on acquisitions or divestitures between Nuveen and TIAA's affiliates or successors. The targets did not adjust if Nuveen acquired investments, advisory businesses, or assets from a TIAA affiliate or successor that did not count towards the Earn-Out amount prior to the acquisition.[13] Nor would those acquired businesses and assets begin counting towards the Earn-Out amount through either Advisory Revenues or Net Flows. Similarly, if Nuveen divested investments, advisory businesses, or assets to a TIAA affiliate or successor that counted towards the Earn-Out amount prior to the divestiture, they continued to count towards

---

[10] Purchase Agreement § 1.8(c)(iii).

[11] *Id.*

[12] *Id.* § 1.8(d).

[13] *Id.* § 1.8(c)(i).

6

Advisory Revenues and Net Flows, and the floor and cap targets remained the same.[14]

With that framework in place, the parties also agreed to protections against intents to smother the Earn-Out. Section 1.8(f) prohibited TIAA from taking, or causing the Subject Companies to take, "any action the intent of which is to reduce the Earn-Out Amount."

Section 1.8(h) lays out the structure for TIAA to provide Windy City with a written statement "setting forth in reasonable detail its good faith calculation of the Earn-Out Amount, including the calculation of Cumulative Net Flows Payment Amount and Cumulative Advisory Revenue Payment Amount" (the "Preliminary Earn-Out Statement"). Windy City could dispute the Preliminary Earn-Out Statement within sixty days of receipt by "setting forth, in reasonable detail, the basis for such dispute." The Purchase Agreement also provided some rights of cooperation between the parties and Windy City's review of TIAA's records:

---

[14] *Id.* § 1.8(c)(ii).

Seller and Buyer shall assist and cooperate with the other in all commercially reasonable respects in Seller's review of, and the resolution of any dispute with respect to, the Preliminary Earn-Out Statement and the calculations of the Earn-Out Amount, Cumulative Net Flows Payment Amount and Cumulative Advisory Revenue Payment Amount, including by providing the other party and its accountants and advisors with reasonable access to relevant personnel (including its accountants), work papers and books and records related to the Subject Companies that are in its possession or under its control. Seller and Buyer shall use their commercially reasonable efforts to cause their accountants and advisors to reasonably cooperate with and respond to the other party's reasonable inquiries.

If, following a dispute, the parties could not agree on the Earn-Out Amount, Section 1.8(h) called for them to submit the issues to a referee (the "Referee") for final resolution.[15]  However, the Referee "shall be bound by the provisions of [] Section 1.8," which the parties agree means, at least in this instance, that the Referee may not determine the meaning of disputed contract terms.  To interpret those terms, the parties would have to seek judicial review first, and then take the Court's interpretations to the Referee for use in determining "disputed items" or "calculations" under the Purchase Agreement.[16]

---

[15] The Purchase Agreement designates Houlihan Lokey as the Referee.  *See id.* § 1.6(b)(ii).

[16] *See id.* §§ 10.15, 10.16 (agreeing to Delaware choices of law and forum).

**B. TIAA Provides, And Windy City Disputes, The Preliminary Earn-Out Statement.**

The sale closed in October 2014. Following that, TIAA began marketing its funds through Nuveen's brand and distribution networks. Nuveen started offering not only funds it advised, but also TIAA-advised funds. Through Nuveen's sales force and distribution, TIAA was able to generate "substantial advisory revenues and net flows."[17]

In January 2018, TIAA delivered its Preliminary Earn-Out Statement to Windy City. TIAA's calculations put Advisory Revenues at $3.141 billion and Net Flows at approximately $17.915 billion.[18] The Preliminary Earn-Out Statement included nearly 100 pages of data supporting the calculation.[19] TIAA contends its data shows that the Earn-Out was based on 100% credit for Nuveen's advisory revenues and net flows generated from providing investment advisory services, 50% credit for revenues and flows on which TIAA or Nuveen served as sub-advisor to the other, and 50% credit for revenues and flows that were advised by Nuveen and distributed through TIAA's captive channel.[20]

---

[17] Compl. ¶ 62.

[18] *Id.* ¶ 63.

[19] Compl. Ex. 3.

[20] Opening Br. 18-19.

9

A month later, TIAA made an unprompted revision based on an error it found, increasing Net Flows to $18.189 billion, but decreasing Advisory Revenues to approximately $3.140 billion. Both the original and revised Statements pegged Advisory Revenues under its floor target of $3.15 billion, and Net Flows over its floor target of $10 billion. Based on the revised Statement, TIAA set the Earn-Out amount due to Windy City at approximately $112.283 million, well below the maximum potential payout of $278 million.[21] TIAA paid Windy City on January 31 and February 27, 2018.

Windy City exercised its contractual rights to review the books and records underlying TIAA's Earn-Out calculations. The Complaint acknowledges that TIAA provided Windy City with a series of documents and a one-hour conference call with TIAA personnel. But it also alleges that TIAA failed to provide:

- Documents relating to "the responsibilities of TIAA's Joint Sales Force;"[22]

- Documents relating to "the extent to which Nuveen employees distributed TIAA Products;"[23]

---

[21] Compl. ¶ 65.

[22] *Id.* ¶ 68.

[23] *Id.*

- Documents relating to "how Nuveen employees were compensated for such sales (for example, through Nuveen's Long Term Performance Program or otherwise);"[24]

- Documents relating to "how Nuveen employees' sales activity for TIAA Products was tracked by TIAA for accounting purposes;"[25]

- "[A]n organizational chart for Nuveen Finance, LLC;"[26]

- "[T]he amount of total advisory revenues and net flows derived from Nuveen's management or distribution of TIAA Products during the relevant three-year period;"[27] and

- "[T]he underlying documents relating to valuation analyses performed by TIAA's outside accounting firm, Ernst & Young ("EY"), including a February 22, 2017 analysis in which EY projected that the cap and floor targets for both Cumulative Advisory Revenue and Cumulative Net Flows would have to be adjusted downward under the terms of the Purchase Agreement."[28]

On March 22, 2018, Windy City disputed the Preliminary Earn-Out Statement. On June 7, 2018, it filed suit in this Court. The primary dispute concerns how to treat TIAA financial products that Nuveen distributed, but did not advise. Windy City seeks a declaratory judgment to settle those rights (Count I), and two counts of specific performance ordering TIAA to comply with Windy City's interpretation of the Purchase Agreement (Counts II and III). The Complaint also

---

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶ 69.

[27] *Id.*

[28] *Id.*

11

alleges TIAA used four specific corporate arrangements to divert money from the Earn-Out in a manner that intentionally depressed the Earn-Out under Section 1.8(f), and seeks an equitable adjustment to the Earn-Out amount in light of those acts (Count IV). Finally, Windy City seeks an order compelling access to TIAA personnel, books, and other records under Section 1.8(h) (Count V).

TIAA moved to dismiss on August 13, 2018 (the "Motion"). The parties completed briefing on October 18. I heard argument on February 13, 2019 (the "Hearing").

## II.    ANALYSIS

TIAA moved to dismiss under Court of Chancery Rules 12(b)(1) and 12(b)(6). Rule 12(b)(1) tests the Court's subject matter jurisdiction. "Plaintiff[] bear[s] the burden of establishing subject matter jurisdiction."[29] "There is a strong public policy in favor of arbitration in Delaware; thus, a motion to dismiss for lack of subject matter jurisdiction will be granted if the 'dispute is one that, on its face, falls within the arbitration clause of the contract.'"[30] Rule 12(b)(6) tests whether plaintiffs have stated a claim. "The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true;

---

[29] *HBMA Hldgs., LLC v. LSF9 Stardust Hldgs. LLC*, 2017 WL 6209594, at *3 (Del. Ch. Dec. 8, 2017).

[30] *Id.* at *3 (quoting *SBC Interactive, Inc. v. Corp. Media Partners*, 714 A.2d 758, 761 (Del. 1998)).

(ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[31]

### A. Count I Is Not Dismissed Because The Definitions Of Advisory Revenues And Net Flows Are Ambiguous.

The parties dispute the interpretations of Advisory Revenues and, less vigorously, Net Flows. The core disagreement is whether revenues or flows advised or managed solely by TIAA, but distributed through Nuveen, generate credit in the Earn-Out calculations.[32] Windy City believes it gets 50% credit for all such gains, while TIAA believes that Windy City only receives credit where Nuveen advised on the financial products.

---

[31] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (quoting *Kofron v. Amoco Chemicals Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[32] *See* Compl. 57 (seeking in prayer for relief declaratory judgment that "under Section 1.8(b) of the Purchase Agreement, in calculating Cumulative Advisory Revenue [and Net Flows], TIAA must include 50% of the advisory revenues [and net flows] derived from Nuveen's distribution of TIAA Products"); *see also id.* ¶ 108 ("Windy City is entitled to a judgment declaring that TIAA must include in its calculation of the Earn-Out Amount (1) 50% of cumulative advisory revenues derived from Nuveen's distribution of TIAA Products; and (2) 50% of cumulative net flows derived from Nuveen's distribution of TIAA Products.").

13

"To determine what contractual parties intended, Delaware courts start with the text."[33] "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[34] "When the contract is clear and unambiguous," Delaware courts "will give effect to the [plain meaning] of the contract's terms and provisions."[35] But when the Court "may reasonably ascribe multiple and different interpretations to a contract, [it] will find that the contract is ambiguous."[36] "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[37] "The court may grant a motion to dismiss based on contractual language, however, only if the contractual language is unambiguous—meaning, the language is susceptible of only one reasonable interpretation."[38]

To prevail on its Motion, TIAA must demonstrate that its interpretations of Advisory Revenues and Net Flows are the only reasonable readings. I find that

[33] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 2019 WL 1068183, at *8 (Del. Mar. 7, 2019).

[34] *Alta Berkeley VI C.V.*, 41 A.3d at 385 (quoting *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998)).

[35] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).

[36] *Id.* at 1160.

[37] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[38] *Fortis Advisors LLC v. Stora Enso AB*, 2018 WL 3814929, at *3 (Del. Ch. Aug. 10, 2018).

TIAA has failed to meet that burden. But Windy City's interpretations are likewise not the only reasonable readings. Each party's constructions leave something to be desired and would require the Court to minimize deliberately placed language or, in some cases, import extra-contractual concepts to reconcile that language.

### 1. Advisory Revenues

As the parties' dispute requires a granular reading of the definition of Advisory Revenues, I restate it here for reference:

> "Cumulative Advisory Revenue" means the cumulative advisory revenues *of the Subject Companies*, from and including January 1, 2015 through and including December 31, 2017, derived from all assets *managed or distributed by the Subject Companies*, provided that "Cumulative Advisory Revenue" shall (i) include only 50% of the cumulative advisory revenues *of the Subject Companies* derived from assets that are *advised by TIAA-CREF* or products that are *distributed through TIAA-CREF captive channels* (except as otherwise provided in Section 1.8(c)) and (ii) exclude all cumulative advisory revenues *of the Subject Companies* derived from general account assets of TIAA-CREF.[39]

TIAA believes that the parties intended to give Windy City credit only where Nuveen helped advise or manage, and not where Nuveen merely distributed TIAA-advised or TIAA-managed financial products. In shorthand form, TIAA reads the disputed portions of Advisory Revenues to provide Earn-Out credit for:

---

[39] Purchase Agreement § 1.8(b) (emphases added).

1.  100% of revenues from products that are advised by Nuveen; except only

2.  50% of revenues from products that are:
    (a) jointly advised by Nuveen and TIAA; or
    (b) advised by Nuveen and distributed by TIAA.

This framework relies on the opening words of the definition: that Advisory Revenues "means the cumulative advisory revenues of the Subject Companies." TIAA reads these words to limit Advisory Revenues to revenues derived from the Subject Companies' advisory work, not mere distribution.[40] Under this interpretation, products solely advised by TIAA cannot generate "advisory revenues of the Subject Companies." Accordingly, TIAA construes "assets that are advised by [TIAA]," which generate 50% Earn-Out credit, to refer to the industry practice of sub-advising arrangements, or joint advising by primary and secondary advisors, between TIAA and Nuveen.[41]

TIAA's insistence that earning Advisory Revenues requires Nuveen to advise or sub-advise carries through to its interpretation of Earn-Out credit from Nuveen's distribution. The definition of Advisory Revenues provides 100% credit for revenues "derived from all assets managed **or distributed** by the Subject

---

[40] Opening Br. 27-28; *see also* Reply Br. 6 ("One does not earn 'advisory revenues' through the distribution of investment products.").

[41] Opening Br. 28.

Companies."[42] TIAA relies on securities law sources[43] to interpret this language as referring to "wrap fee" financial products that include both advisory and distribution activities.[44] It also argues that the parties must have intended Advisory Revenues to only count services where Nuveen at least partly advised, because, otherwise, the addition of even 50% credit for products advised solely by TIAA would render the floor and cap targets for both Advisory Revenues and Net Flows too low to serve as Earn-Out benchmarks.[45] In other words, TIAA claims that the Purchase Agreement's default floor and cap targets must be based on Nuveen advisory services, not TIAA services distributed through Nuveen. Finally, TIAA contends its interpretation avoids an unintuitive result of giving Windy City 100% credit where Nuveen solely distributes a financial product advised by a third party, but only 50% credit where Nuveen distributes the same product advised by TIAA.[46]

---

[42] Purchase Agreement § 1.8(b) (emphasis added).

[43] Opening Br. 31-32.

[44] TIAA asserts that any other reading would render the phrase "investment advisory revenues" meaningless. *See id.* at 31-32. "Investment advisory revenues" does not appear in the definition of Advisory Revenues, or anywhere else in TIAA's brief, and TIAA does not indicate where it comes from. I assume that TIAA instead meant the phrase "cumulative advisory revenues of the Subject Companies" from the Advisory Revenues definition.

[45] *Id.* at 34; Hearing Tr. 12:7-20. TIAA applies this same argument to Net Flows.

[46] Hearing Tr. 70:3-12; *accord Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

17

For its part, Windy City reads the definition of Advisory Revenues to "include[] not only the assets that Nuveen itself managed, but also those assets that Nuveen had no role in managing but nonetheless 'distributed' through its extensive salesforce."[47]  Windy City points to the language that Advisory Revenues are "derived from *all* assets managed *or distributed* by the Subject Companies" and to the 50% credit given for Advisory Revenues "derived from assets that are ***advised by TIAA-CREF*** or products that are ***distributed through TIAA-CREF*** captive channels."[48]  According to Windy City, these two phrases are rendered meaningless if the prefatory phrase of "cumulative advisory revenues of the Subject Companies" limits the definition to revenues from Nuveen's own advising.  Put another way, Windy City argues Advisory Revenues cannot be limited to revenues Nuveen generated by advising because they must be able to be "derived from all assets . . . distributed" by Nuveen and "derived from assets that are advised by [TIAA]."  Finally, Windy City derides TIAA's construction of the "derived from" phrases based on "sub-advisement" and "wrap fee" concepts, as improperly modifying Section 1.8(b) and reading out the plain language.[49]

_____

[47]  Answering Br. 13-14.

[48] Purchase Agreement § 1.8(b) (emphases added).

[49] Answering Br. 16-20.  Moreover, other areas of the Purchase Agreement refer to sub-advising arrangements, and so its absence in Section 1.8(b) weighs against TIAA's attempt to import the concept into the text.  *See, e.g.*, Purchase Agreement §§ 1.8(c)(ii), 1.8(c)(iv), 2.18(e); 2.19(a)(v); Purchase Agreement 138.

The parties' dispute hinges on the interpretation of "cumulative advisory revenues of the Subject Companies," which appears twice in the relevant portions of the definition. TIAA reads that term strictly to include only revenues earned by the Subject Companies from their advising. This is intuitive for that particular phrase, but requires a strained reading of nearly everything else in the definition. For instance, TIAA's construction demands extrinsic evidence and divergence from the plain meaning to read language giving Earn-Out credit for Nuveen's distributions as actually referring to a niche class of "wrap fee" products. It also inserts the concept of sub-advising into the definition's reference to assets advised by TIAA. That is problematic because the Purchase Agreement uses that same term elsewhere,[50] which suggests the parties chose not to use it in Section 1.8(b).

Windy City's construction, on the other hand, brings more intuitive readings of the phrases "derived from all assets managed or distributed by the Subject Companies" and "derived from assets that are advised by TIAA-CREF or products that are distributed through TIAA-CREF captive channels." But Windy City stretches the "cumulative advisory revenues of the Subject Companies" language to mean something more like revenues that involve advising and some participation

_____

[50] *See, e.g.*, *id.* §§ 1.8(c)(ii), 1.8(c)(iv), 2.18(e); 2.19(a)(v); *id.* at 138.

from the Subject Companies.   Neither reading is perfect, and neither reading provides the "only reasonable" way to understand Section 1.8(b).[51]

## 2. Net Flows

The parties' disagreements on Net Flows are similar to those on Advisory Revenues.  For reference, the definition of Net Flows reads:

> "Cumulative Net Flows" means the amount, if any, of the excess of all Additions to **assets under management by the Subject Companies** over Withdrawals from **assets under management by the Subject Companie**s (excluding (a) in each case any increase or decrease in assets under management resulting from market appreciation or depreciation, and (b) dividends and distributions (as Withdrawals), but including reinvestments of dividends and distributions (as Additions)), from and including January 1, 2015 through and including December 31, 2017, provided that "Cumulative Net Flows" shall (i) include only 50% of assets added or withdrawn that are **third-party assets advised by TIAA-CREF or third-party products distributed through TIAA-CREF captive channels** and (ii) exclude all assets added or withdrawn that are general account assets of TIAA-CREF.[52]

Net Flows' definition is built on "assets under management by the Subject Companies."[53]  From that language, TIAA asserts Section 1.8(b) makes "plain that it is net flows generated by Nuveen's success in retaining and attracting assets under its management that matters."[54]  Because Net Flows' definition does not explicitly

---

[51] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine Partners 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014) (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[52] *Id.* § 1.8(b) (emphases added).

[53] *Id.*

[54] Opening Br. 28-29.

20

reference distribution by Nuveen, TIAA also argues that Windy City cannot seek credit for distribution via its Advisory Revenues arguments.

In response, Windy City points to romanette (i) in the Net Flows definition, which provides Earn-Out credit for "only 50% of assets added or withdrawn that are third-party assets advised by TIAA-CREF or third-party products distributed through TIAA-CREF captive channels." Windy City reads this phrase to provide credit for products that are advised by TIAA, but distributed by Nuveen.[55]

TIAA's interpretation, that the Earn-Out should get credit only for flows Nuveen managed or partly managed, matches well with the opening lines of the definition. But it clashes with romanette (i), which requires that the Earn-Out include 50% credit for third-party assets that TIAA advised. TIAA's reading here again requires importing some concept of sub-advising to harmonize the interpretation.[56] But the plain text does not invoke that concept.

Windy City's reading has a similar outcome, if in reverse. It fits more comfortably with the mechanics of the Earn-Out receiving 50% credit for third-party assets advised by TIAA and distributed by Nuveen.[57] But the definition's language tying Net Flows to "assets under management by the Subject Companies" does not

---

[55] Answering Br. 14 n.3.

[56] Opening Br. 29.

[57] The parties have not argued that the "third-party assets" language in the Net Flows definition favors one party's interpretation or the other.

neatly support Windy City's distribution theory. Neither party provides the only reasonable interpretation.

\* \* \*

At the motion to dismiss stage, no party has offered the only reasonable construction. "If, after applying [] canons of contract interpretation, the contract is nonetheless reasonably susceptible to two or more interpretations or may have two or more different meanings, then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent."[58] Extrinsic evidence will be necessary here to find what the parties truly meant. That will allow the Court to decide which reading prevails, and which language to minimize in line with the parties' drafting intentions.

## B. The Court Has Jurisdiction Over Counts II And III, And Counts II And III State Claims.

Counts II and III seek specific performance ordering TIAA to calculate the Earn-Out amount in accordance with Windy City's interpretation of Section 1.8. Specifically, they ask for an order "requiring TIAA to include in its calculation of Cumulative Advisory Revenue advisory revenues derived from Nuveen's distribution of TIAA Products . . . . [and] requiring TIAA to include in its calculation of Cumulative Net Flows flows derived from Nuveen's distribution of TIAA

---

[58] *Sunline Commercial Carriers*, 2019 WL 1068183, at \*8 (quotation omitted).

22

Products."[59] TIAA opposes these orders on the same substantive grounds as Count I,[60] but also asserts that the Court lacks jurisdiction to decide Counts II and III because they compel a particular calculation and therefore invade the Referee's province under Section 1.8(h).[61] Windy City responds that Counts II and III seek only to determine and enforce the same legal right as Count I, not a particular monetary calculation, and thus the Court, rather than the Referee, has jurisdiction.[62]

The parties agree that the Referee must answer questions on calculating the Earn-Out amount, but that this Court has jurisdiction to answer interpretative questions under Section 1.8.[63] At the Hearing, Windy City's counsel conceded that

---

[59] Compl. ¶¶ 120, 132.

[60] To the extent TIAA seeks dismissal on 12(b)(6) grounds, the analysis from Count I applies and prevents dismissal at this stage. Counts II and III reasonably plead a breach of Section 1.8 on Windy City's theory of interpretation.

[61] Opening Br. 37-38. Section 1.8(h) requires that the parties submit disputes to the neutral Referee to determine "disputed items or calculations" in a "final, binding and conclusive" report that "shall be bound by the provisions of [] Section 1.8."

[62] Answering Br. 30.

[63] Opening Br. 37, 52 n.32 ("While the Referee is not called upon to resolve legal disputes as to the meaning of the Purchase Agreement—which is the subject of Count I of the Complaint—the Referee is more than capable and specifically tasked with performing the calculations necessary to determine the Earn-Out Amount" . . . . "Once the Court construes the terms of Section 1.8(h) as outlined here, it should dismiss this claim because the calculation of the Earn-Out Amount is a task for the Referee pursuant to the process outlined in Section 1.8(h)."); Answering Br. 30-31 ("It thus appears that the Parties are in full agreement about the only jurisdictional issue that matters in this case: This Court can and should decide the issues of contract interpretation currently before it. Once those legal disputes are resolved, the Parties will return to the Referee to resolve any remaining

there is "not a whole lot" of daylight between Count I, on the one hand, and Counts II and III, on the other.[64]    Because all three Counts depend on a determination favoring Windy City's interpretation of Section 1.8, Windy City believes that it "would have the exact same remedies under Counts I, II, or III."[65]

If Counts II and III requested an order compelling TIAA to include a specific calculated amount or figure in the Earn-Out amount, they would infringe on the Referee's jurisdiction to determine the "disputed items or calculations," "bound by the provisions of [] Section 1.8."  But Windy City has shown that it, instead, seeks only a different remedy to enforce the same outcome and legal question at issue in Count I:  which party has the right interpretation.  While Counts II and III seem duplicative of the ultimate relief in Count I, they do not fail for lack of jurisdiction or failure to state a claim.  I deny the Motion on this ground, but note that I do not view Counts II or III to provide for any greater relief or scope of contractual interpretation than Count I, other than the form of the remedy.

---

questions about the calculations of the Earn-Out Amount, with the benefit of this Court's ruling on the contact interpretation questions.").

[64] Hearing Tr. 69:13-15.

[65] *Id.*

24

## C. Count IV States A Claim.

Count IV seeks an equitable adjustment to the Earn-Out amount to rectify TIAA's allegedly improper actions that intentionally depressed the Earn-Out amount, including by failing to adjust the targets for Advisory Revenues and Net Flows.[66] Windy City bases Count IV on a series of four corporate actions. Windy City failed to press one of these corporate actions, a rebranding of Nuveen's parent entity under TIAA, in its answering papers opposing the Motion and at the Hearing. TIAA pointed out Windy City's silence in both its reply papers and at the Hearing.[67] I agree that Windy City abandoned what the parties have described as the "rebranding" claim, and therefore do not address it.[68] But I find that the Complaint pleads each of the remaining bases for Count IV in reasonable detail and adequately alleges breaches of Section 1.8.

TIAA challenges Count IV on two main grounds: first, that the Purchase Agreement did not give Windy City the right to prevent TIAA from undertaking any of the actions Windy City references; and second, that Windy City has failed to

---

[66] Compl. ¶¶ 133-139.

[67] *See* Reply Br. 23-24; Hearing Tr. 35:22-36:9.

[68] *See* Compl. ¶¶ 81-85; *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *7 (Del. Ch. Jan. 11, 2010) ("Plaintiffs quietly abandoned this claim in their brief in opposition to defendants' motion to dismiss, by failing to address or respond to defendants' arguments in their motion to dismiss.").

allege a breach of Section 1.8(f)'s intent requirement and damages. I reject both arguments. The Complaint pled that TIAA conceivably took each of the actions at issue in Count IV with an intent to depress the Earn-Out amount.[69] TIAA's efforts to refute Windy City's version of the facts are not appropriate at the motion to dismiss stage, where Windy City has pled its allegations adequately.[70] The more pertinent challenges at this stage are to the sufficiency of Windy City's pleadings. TIAA contends that Windy City failed to plead damages, or a breach of the Purchase Agreement, with respect to any of the alleged actions.[71] I disagree.

First, Windy City alleges that TIAA consolidated and liquidated certain funds from NWQ Investment Management Company, LLC ("NWQ"), an affiliate operated by Nuveen prior to the transaction, in a manner that failed to give Windy City appropriate Earn-Out credit. Windy City supports its theory by noting that EY prepared a valuation report anticipating a reduction in the Earn-Out targets. Although the report did not specify the cause of that reduction, it stated that the targets were "subject to adjustments as discussed in Section 1.8 of the [Purchase

---

[69] *See id.* ¶¶ 86-95, 133-139.

[70] "Long standing Delaware case law holds that a complaint will survive a motion to dismiss if it states a cognizable claim under any 'reasonably conceivable' set of circumstances inferable from the alleged facts." *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013), *as corrected* (Oct. 8, 2013).

[71] Opening Br. 40-50.

Agreement]," and Windy City alleges that "TIAA appears to have been considering . . . a divestiture or transfer at or around the time EY prepared its valuation report."[72] Windy City has asked for more information about EY's valuation, and TIAA has allegedly refused to provide further access.[73] When prodded about the report, TIAA contended that "Nuveen management ultimately made different decisions with respect to the way it structured its reorganization of NWQ and associated liquidation of funds that obviated the need for an adjustment to the Floor and Cap Targets."[74] Windy City alleges that those decisions, in light of EY's report, indicate "that TIAA's decisions about how to dispose of NWQ funds was made, at least in part, with the purpose and intent of reducing the Earn-Out Amount."[75] According to the Complaint, EY's suggested target reductions "would have [] entitled [Windy City] to approximately $27 million dollars more in its earn-out payment from TIAA."[76]

Second and third, Windy City alleges that TIAA wound down another Nuveen affiliate, Tradewinds Global Investors, LLC ("Tradewinds"), and a series of other Nuveen funds (the "Nuveen Funds"), without attempting to sell or transfer portions

---

[72] Compl. ¶¶ 86-91. Windy City received the valuation report from TIAA in early 2018. *See id.* ¶ 87.

[73] *Id.* ¶ 91.

[74] *Id.*

[75] *Id.*

[76] *Id.* ¶ 90.

of those funds and preserve value.[77]  Under Section 1.8(c)(iii) of the Purchase Agreement, Advisory Revenues and Net Flows targets are adjusted when portions of a Nuveen fund are divested to third parties not affiliated with TIAA.  Accordingly, Windy City asserts that TIAA disposed of Tradewinds and the Nuveen Funds in a manner that avoided a target adjustment, and thus "adversely affected Nuveen's advisory revenues and net flows."  Windy City also alleges that TIAA did so intentionally.[78]

Drawing all inferences in Windy City's favor and recognizing the low standard of reasonable conceivability, Windy City has pled that these three transactions implicate a potential breach of Section 1.8(f) that intentionally depressed the Earn-Out and harmed Windy City.  To the extent TIAA disagrees with the specificity of damages pled, it seeks a pleading standard higher than is required.[79]  Windy City has also credibly explained that its ability to allege damages was weakened by the subject of Count V—TIAA's alleged failure to provide contractual access to books and records supporting the Preliminary Earn-Out Statement.  I deny the Motion against Count IV.

---

[77] *Id.* ¶¶ 92-95.

[78] *Id.* ¶¶ 93, 95.

[79] "Proof of [alleged] damages and of their certainty need not be offered in the complaint in order to state a claim." *IAC Search, LLC v. Conversant LLC*, 2016 WL 6995363, at *8 (Del. Ch. Nov. 30, 2016) (quoting *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003)).

### D.  Count V States A Claim.

Count V seeks an order of specific performance permitting greater access to personnel, work papers, books, and records under Section 1.8(h).  The relevant language of Section 1.8(h) provides that the parties "shall assist and cooperate with the other in all commercially reasonable respects" for Windy City to review and resolve disputes relating to the Preliminary Earn-Out Statement and calculations of the Earn-Out amount, Advisory Revenues Payment Amount, and Net Flows Payment Amount, "including by providing the other party and its accountants and advisors with reasonable access to relevant personnel (including its accountants), work papers and books and records related to the Subject Companies that are in its possession or under its control."  The parties also agreed to "use their commercially reasonable efforts to cause their accountants and advisors to reasonably cooperate with and respond to the other party's reasonable inquiries."  Windy City alleges that TIAA has improperly resisted certain of its demands under Section 1.8(h).

TIAA hinges its argument here on a contention that Section 1.8(h) provides access to information in response to Windy City's demands only to the extent they "relate[] to the Subject Companies."[80]  TIAA contends it is only refusing Windy

---

[80] Opening Br. 52.

City's requests that improperly "demand information on other topics, including other aspects of TIAA's business."[81]

Section 1.8(h) grants Windy City broad access rights to review and attempt to resolve "*any* dispute with respect to [] the Preliminary Earn-Out Statement and the calculations of the Earn-Out Amount, Cumulative Net Flows Payment Amount and Cumulative Advisory Revenue Payment Amount."[82]  Those rights "include[] . . . reasonable access" to certain materials "related to the Subject Companies that are in [TIAA's] possession or under its control."[83]  But that access right does not limit Windy City's broader, bargained-for right of commercially reasonable cooperation.[84]  And even if it did, Windy City's requests with respect to Section 1.8(h) and how TIAA has calculated the Earn-Out amount and statements "relate[] to the Subject Companies" under the plain language of Section 1.8(h) by seeking information about whether funds were diverted away from those companies under the Earn-Out provisions.  I deny the Motion as to Count V.

## III. CONCLUSION

For these reasons, I deny TIAA's Motion to Dismiss.

**IT IS SO ORDERED.**

---

[81] *Id.*

[82] Purchase Agreement § 1.8(h) (emphasis added).

[83] *Id.*

[84] *Id.*